2009 UT App 262

**STATE of Utah, Plaintiff and Appellee,**

v.

**Azlen Adieu Forquoit MARCHET, Defendant and Appellant.**

No. 20080186–CA.

Court of Appeals of Utah.

Sept. 17, 2009.

Ronald J. Yengich and Elizabeth Hunt, Salt Lake City, for Appellant.

Mark L. Shurtleff and Marian Decker, Salt Lake City, for Appellee.

Before Judges THORNE, BENCH, and McHUGH.

## AMENDED OPINION [1]

McHUGH, Judge:

¶ 1 Azlen Adieu Forquoit Marchet appeals from a conviction for rape, a first degree felony, *see* Utah Code Ann. § 76–5–402 (2008).[2] Marchet contends that the trial

---

1. This Amended Opinion replaces the Opinion issued on July 30, 2009, in this matter.

2. Because the portions of the Utah Code relevant to our opinion are unchanged from the version in effect at the time this matter arose, we cite to the

court did not properly instruct the jury as to the required mental state for the crime of rape. He also claims that his trial counsel was ineffective in failing to request a mistake of fact instruction. Finally, he argues that the trial court erred in admitting the testimony of other women who alleged that Marchet had raped them. *See generally* Utah R. Evid. 404(b) (stating that evidence of the defendant's other bad acts may be admitted in certain circumstances). We affirm.

## BACKGROUND

¶2 On April 29, 2005, Marchet was charged by information with the rape of B.F., committed during the fall of 2002. The State moved to admit testimony from three other women who claimed that Marchet had also raped them. The State argued that the admission of this testimony was proper under rule 404(b) of the Utah Rules of Evidence. Judge Timothy R. Hanson disagreed and denied the State's motion.

¶3 The case was later assigned to Judge Robert K. Hilder, and the State renewed its motion to admit testimony from three of Marchet's accusers, including evidence from two women whose testimonies were not offered in the State's first motion to Judge Hanson. The State argued that admission of the testimony was proper to show Marchet's intent, preparation, plan, knowledge, absence of mistake or accident, and B.F.'s lack of consent. During the evidentiary hearings on the motion, the trial court heard testimony from B.F. and from two other alleged victims, M.P. and N.R. The court also reviewed the transcript from the unsuccessful prosecution of a prior rape charge against Marchet, including the testimony of J.C., the complainant in that case.

¶4 After comparing the witnesses' testimony, Judge Hilder identified factual similarities between B.F.'s allegations and the allegations of M.P., J.C., and N.R. Of those similarities, the trial court highlighted four that it found particularly probative of the issue of consent: (1) Marchet's initial charm, followed by persistence and the exercise of physical power; (2) escalation in the intensity of his sexual advances, which all occurred in Marchet's home shortly after meeting; (3) forceful removal of the women's clothing after he was told to stop; and (4) penetration from behind during the sexual encounter. The court granted the State's motion to admit testimony from M.P. and J.C., but excluded the testimony of N.R.[3]

¶5 During its opening statement, the State informed the jury that testimony from the other women would be presented to show that Marchet "had a set plan." The State explained that the jury could also consider the testimony "to decide if [B.F.] did[ ] or did not consent to sexual intercourse with [Marchet]."

### B.F.'s Testimony

¶6 At trial, B.F. testified that she met Marchet at a Salt Lake City dance club in the fall of 2002. B.F. noted that Marchet weighed approximately 250 pounds and was well over six feet tall, while she weighed 120 pounds and was five feet five inches tall. Marchet was friendly and repeatedly requested that B.F. come to his home. B.F. refused but invited Marchet to join her at the home of her friend, Vhanessa. Marchet followed B.F. and Vhanessa to a gas station where he left his car and rode in B.F.'s car to Vhanessa's home.

¶7 While at Vhanessa's home, B.F. claimed she had no sexual contact with Marchet. Although Marchet continued to invite B.F. to accompany him to his home, she refused. Around 3:00 a.m., she agreed to drive him back to his car. Their route took them past where Marchet had left his car, but he directed her to his apartment instead. Marchet then persuaded B.F. to come inside. Upon entering the apartment, B.F. put her cell phone and car keys in clear view on the coffee table or couch in the living room.

¶8 Marchet took B.F. upstairs to his bedroom to watch a movie. B.F. sat on Mar-

current version of the code for the convenience of the reader.

3. The trial court's decision to exclude N.R.'s testimony appears to be based upon the risk of overriding hostility by the jury as a result of the facts unique to that encounter with Marchet.

chet's bed, which was the only piece of furniture in the room. Marchet pushed B.F. back onto the bed and began trying to remove her clothing. When B.F. protested, Marchet said, "You know you want this." After lowering B.F.'s pants to her knees, Marchet left the room to get a condom. B.F. pulled up her pants, and when Marchet reentered the room, she told him that she did not want to have sex with him. At that point, Marchet used his body weight to restrain B.F. while he undressed and raped her. During the rape, Marchet positioned B.F. to penetrate her from behind.

¶ 9 When B.F. got up to dress, Marchet insisted on walking B.F. to her car. On her way out, B.F. grabbed her car keys, which were in plain view, but did not see her cell phone. Marchet then pulled her cell phone from under a couch cushion. Marchet acted like "a perfect gentleman" as he walked B.F. to her car; he told B.F. that it did not have to be a "one night stand" and that he would call her later. B.F. responded that he did not have to call. Although B.F. told Vhanessa about the rape the next day, she did not report it to authorities until 2005, over two years after the incident.

*M.P.'s Testimony*

¶ 10 The State introduced the testimony of M.P. in support of B.F.'s allegations that her sexual intercourse with Marchet was nonconsensual. M.P. testified that she met Marchet, who introduced himself as Cody, at a dance club in July 2004. Shortly after meeting, Marchet asked M.P. on a date and she told him, "no." However, Marchet was "very persistent" and persuaded her to go to his house that night to watch a movie.

¶ 11 When M.P. entered Marchet's home, she placed her purse and cell phone on the coffee table in the living room. Marchet told M.P. that the only television in the house was in his bedroom. Once in his bedroom, Marchet turned on a movie while M.P. sat on the edge of the bed. Marchet lay down next to M.P. and pulled her into a "spooning" position with his chest to M.P.'s back. When he began to kiss M.P.'s shoulders and back, M.P. told him to stop. Marchet then reached forward, removed M.P.'s pants, and began to rape her, penetrating her from behind. M.P. repeatedly told him to stop. Marchet became increasingly forceful, using his body weight to restrain M.P. At some point, the condom Marchet was wearing fell off and M.P. noticed it had blood on it. After the rape, M.P. attempted to dress, but Marchet pulled her back onto his bed to "cuddle." When M.P. protested, Marchet began raping her again.

¶ 12 As she prepared to leave, M.P. found her purse where she left it on the coffee table, but she did not see her cell phone. Marchet then removed her phone from behind a couch cushion. M.P. went home and bathed. In the morning she called her neighbor, a Sandy City police officer, and reported the rape.

*J.C.'s Testimony*

¶ 13 The State also offered the testimony of J.C. as evidence in the trial on the charges stemming from B.F.'s allegations. J.C. testified that she met Marchet at a downtown bar in March 2005; she gave him her telephone number. Marchet called her the next day and said his name was Cody. J.C. agreed to meet Marchet at his home later that evening. When J.C. arrived at Marchet's home, he suggested that they watch a movie. J.C. agreed, although she told him she had plans to meet friends and could not stay long.

¶ 14 Marchet took her to his bedroom to watch the movie and J.C. sat on the edge of the bed. Marchet lay next to J.C. and put his hand on her thigh. J.C. told Marchet she "didn't feel comfortable with that and pushed [his hand] off." Marchet then pulled J.C. into a "spooning" position. After several minutes of lying in that position, Marchet attempted to remove J.C.'s pants, and J.C. pulled them back on. Marchet then became aggressive, restraining J.C. while he removed her clothing. He positioned J.C.'s body so she was "on all fours" and began to rape her. Marchet pulled J.C.'s hair, forcing her to look into a mirror while he raped her. When she closed her eyes, he bit her until she opened them. J.C. claimed she did not verbally protest during the rape because she was afraid of Marchet. After J.C. dressed, Marchet walked her to her car and kissed

her on the mouth. J.C. reported the rape to authorities the next day.[4]

*Marchet's Testimony*

¶ 15 Marchet also testified at trial. He agreed that he and B.F. had sexual intercourse but claimed it had been consensual. He stated that he and B.F. "kissed" and had "sexual contact" while at Vhanessa's house. Marchet testified that he and B.F. then left for his home, went directly to his bedroom, and engaged in consensual sexual intercourse. He claimed that at 7:45 that morning he and B.F. picked up his car and then returned to his apartment and had sex again. Marchet stated that he and B.F. had "textbook sex" that night but because she did not return his calls, they did not go out again.

¶ 16 During closing argument, the prosecutor reminded the jury that they were "entitled to consider the testimony of M[.P.] and ... J[.C.] in assessing whether or not [B.F.] consented [and] in assessing [Marchet's] plan." The State added that the testimony of M.P. and J.C. could be relied on for purposes of "show[ing] intent, ... absence of mistake [and,] ... that B[.F.] did not consent to having sex with [Marchet]." Marchet was convicted of rape, and this appeal followed.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 17 On appeal, Marchet contends that the trial court incorrectly instructed the jury as to the proper mental state for the consent element of the crime of rape. "Whether a jury instruction correctly states the law presents a question of law which we review for correctness." *State v. Houskeeper*, 2002 UT 118, ¶ 11, 62 P.3d 444.

■ ¶ 18 Marchet also claims that his trial counsel rendered ineffective assistance by failing to request a mistake of fact instruction. "Where, as here, a claim of ineffective assistance of counsel is raised for the first time on appeal without a prior evidentiary hearing, it presents a question of law." *State v. Chavez–Espinoza*, 2008 UT App 191, ¶ 8, 186 P.3d 1023 (internal quotation marks

omitted), *cert. denied*, 199 P.3d 367 (Utah 2008).

■ ¶ 19 Marchet further argues that the trial court erred by admitting the testimony of M.P. and J.C. "[W]e review a trial court's decision to admit evidence under rule 404(b) of the Utah Rules of Evidence under an abuse of discretion standard." *State v. Nelson–Waggoner*, 2000 UT 59, ¶ 16, 6 P.3d 1120. In doing so, "[w]e review the record to determine whether the admission of other bad acts evidence was scrupulously examined by the trial judge in the proper exercise of that discretion." *Id.* (internal quotation marks omitted).

## ANALYSIS

### I. Jury Instructions

#### A. Marchet's Proposed Instruction

■ ¶ 20 At trial, Marchet proposed an instruction that would have told the jury to acquit if it found Marchet had a good faith belief that B.F. consented to sexual intercourse. The trial court rejected that instruction because it might confuse the jury into thinking that Marchet's mental state should be evaluated on a subjective, rather than an objective, basis. Instead, the trial court proposed Instruction 16, which states,

> In the crime of rape, the required mental state must exist at the time of the commission of the crime. The crime of rape requires that the defendant acted intentionally, knowingly, or recklessly. Those mental states are defined in these Instructions, and the State must prove the existence of the required mental state beyond a reasonable doubt. Therefore, if after a consideration of all the evidence you have a reasonable doubt that the defendant had the necessary intent at the time of the sexual intercourse, you must find him not guilty of rape.

Marchet's trial counsel approved this instruction as a "fair compromise." Because the record does not contain the language of Marchet's proposed instruction, *see Hansen v. Stewart*, 761 P.2d 14, 17 (Utah 1988) (refus-

---

4. Marchet was tried and acquitted of rape charges based upon his encounter with J.C. Nei-

ther B.F. nor M.P. was permitted to testify at that trial.

ing to consider challenge to jury instructions where copies of proposed instructions were not part of the record); *State v. Morgan*, 865 P.2d 1377, 1379 n. 1 (Utah Ct.App.1993) ("We cannot review the denial of a requested instruction unless it is included in the record."), and because trial counsel approved the instruction proposed by the court, *see State v. Harmon*, 956 P.2d 262, 269 (Utah 1998) (noting that defense counsel waives any right to challenge a jury instruction on appeal, if he approves it in the trial court), we do not consider this argument further.

## B. Required Mental State

■ ¶ 21 Marchet next argues that the trial court erred by instructing jurors that they could convict him of rape if they found the following beyond a reasonable doubt:

1. That on or about October 1, 2002 through November 30, 2002, in Salt Lake County, State of Utah, the defendant, Azlen Adieu [Forquoit] Marchet, had sexual intercourse with B[.F.]; and

2. That said act of intercourse was without the consent of B[.F.]; and

3. That the defendant acted intentionally or knowingly or recklessly.

Marchet contends that the language of this instruction—Instruction 13—does not adequately inform the jury that the State had the burden of proving his mental state with regard to each element of the crime of rape. Specifically, Marchet claims that the instruction "did not require the jury to find any mental state on [Marchet's] part with regard to B.F.'s consent or lack thereof."

¶ 22 Utah Code section 76–5–402 defines the crime of rape as consisting of two elements: (1) the act of sexual intercourse (2) committed without the other person's consent. *See* Utah Code Ann. § 76–5–402 (2008). Utah Code section 76–2–101(1) provides the necessary mental state: "A person is not guilty of an offense unless the person's conduct is prohibited by law[ ] and ... the person acts intentionally, knowingly, [or] recklessly...." *Id.* § 76–2–101(1). Contrary to Marchet's assertions, Instruction 13 accu-

rately identified each element of the crime of rape and correctly stated the applicable mental state. The jurors were instructed that to convict Marchet, they must find beyond a reasonable doubt that he intentionally, knowingly, or recklessly had nonconsensual sexual intercourse with B.F. The instruction is an accurate statement of the law, and we reject Marchet's claim that it was erroneous.

■ ¶ 23 Furthermore, "[w]e review a challenged jury instruction in context with all other jury instructions provided to the jury." *Normandeau v. Hanson Equip., Inc.*, 2007 UT App 382, ¶ 16, 174 P.3d 1, *rev'd on other grounds*, 2009 UT 44. Where "the jury instructions as a whole fairly instruct the jury on the applicable law, reversible error does not arise merely because one jury instruction, standing alone, is not as accurate as it might have been." *Id.* (internal quotation marks omitted); *see also State v. Harper*, 2006 UT App 178, ¶ 14, 136 P.3d 1261 ("[I]f taken as a whole [the jury instructions] fairly instruct the jury on the law applicable to the case, the fact that one of the instructions, standing alone, is not as accurate as it might have been is not reversible error." (first alteration in original) (internal quotation marks omitted)). Here, the jurors were also instructed that "the required mental state must exist at the time of the commission of the crime" and that if they had "reasonable doubt that the defendant had the necessary intent at the time of the sexual intercourse, [they] must find him not guilty of rape." We believe that the instructions as a whole communicated to the jury that Marchet was guilty of rape not simply if he knowingly, intentionally, or recklessly had sexual intercourse with B.F., but only if he knowingly, intentionally, or recklessly did so without B.F.'s consent. If the circumstances were such that B.F.'s conduct objectively conveyed consent, rather than lack of consent, at the time of the sexual intercourse, the jury instructions adequately informed the jurors that they could not find that Marchet possessed the minimum criminal mental state of recklessness.[5] Therefore, we hold that the

---

**5.** The jury was instructed

    A person engages in conduct recklessly with respect to circumstances surrounding his con-

duct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustified risk that the circumstances

jury was properly informed both as to the elements of the crime and the required mental state.

## II. Ineffective Assistance of Counsel

¶ 24 Marchet next argues that his trial counsel rendered ineffective assistance by failing to request a mistake of fact instruction. To prevail on an ineffective assistance claim, Marchet bears the burden of establishing each of the components of the two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Nicholls v. State*, 2009 UT 12, ¶ 36, 203 P.3d 976. "First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Furthermore, "proof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality." *Nicholls*, 2009 UT 12, ¶ 36, 203 P.3d 976 (internal quotation marks omitted).

¶ 25 Utah Code section 76–2–304(1) states, "Unless otherwise provided, ignorance or mistake of fact which disproves the culpable mental state is a defense to any prosecution for that crime." Utah Code Ann. § 76–2–304(1). Marchet claims that under his theory of the case, the jurors should have been instructed that he mistakenly believed B.F. consented to sexual intercourse.

¶ 26 We agree with the State that a mistake of fact instruction would have been inconsistent with Marchet's defense at trial. Marchet testified that he and B.F. engaged in sexual contact at Vhanessa's house and that later B.F. willingly accompanied him to his apartment, where the couple immediately retired to his bedroom and had "textbook sex." Marchet further claimed that the next morning he and B.F. left his apartment to retrieve his car and then returned and engaged in consensual sexual relations again. Effectively, Marchet testified that B.F. was not truthful at trial and that she enthusiastically consented to repeated incidents of sexual intercourse with him. Marchet argued that his interaction with B.F. was consistent with casual sexual encounters practiced routinely in this state and throughout the country. According to Marchet, there was nothing about his encounter with B.F. that gave him reason to suspect anything was amiss.

¶ 27 Assuming that the jurors resolved the contest of credibility in favor of Marchet, there would be no need for a mistake of fact instruction and the use of one may have weakened his defense. In contrast, if the jury believed B.F.'s version of the facts, there is nothing in section 76–2–304(1) that would allow Marchet to ignore the fact that B.F. put her clothes back on while he was out of the room and unambiguously indicated that she did not want to have sex with him. *See generally* Utah Code Ann. § 76–5–406(1) (2008) ("An act of ... rape ... is without consent of the victim [where] ... the victim expresses lack of consent through words or conduct...."). Under these circumstances, trial counsel reasonably could have concluded that a mistake of fact instruction had no place in Marchet's defense. *See State v. Pecht*, 2002 UT 41, ¶ 41, 48 P.3d 931 ("A defendant cannot prevail on a claim of ineffective assistance of counsel where 'the challenged act o[r] omission might be considered sound trial strategy.'" (quoting *State v. Parker*, 2000 UT 51, ¶ 10, 4 P.3d 778)). Consequently, we conclude that Marchet has not met his burden to show that trial counsel's performance was deficient. Therefore, we need not reach the second part of the *Strickland* test in concluding that his ineffective assistance of counsel argument fails. *See Nicholls*, 2009 UT 12, ¶ 40, 203 P.3d 976 ("Because Nicholls has failed to satisfy the first prong of *Strickland*, we need not reach the second prong—that Nicholls was prejudiced by his counsel's performance.").

## III. Rule 404(b) Analysis

¶ 28 Rule 404(b) of the Utah Rules of Evidence instructs that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to

---

exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

show action in conformity therewith." Utah R. Evid. 404(b). However, rule 404(b) does allow for the admission of bad acts evidence for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Thus, "evidence . . . offered under [rule] 404(b)[ ] is admissible if it is relevant for a non-character purpose and meets the requirement of Rules 402 and 403 [of the Utah Rules of Evidence]." *Id.* R. 404 advisory comm. note.

¶ 29 A decision as to the admissibility of bad acts evidence involves a three-step process. First, "the trial court must . . . determine whether the bad acts evidence is being offered for a proper, noncharacter purpose, such as one of those specifically listed in rule 404(b)." *State v. Nelson–Waggoner*, 2000 UT 59, ¶ 18, 6 P.3d 1120. In contrast, if the trial court concludes that the bad acts evidence is "being offered only to show the defendant's propensity to commit crime, then it is inadmissible and must be excluded at that point." *Id.* If the purpose is deemed proper, "the court must [next] determine whether the bad acts evidence meets the requirements of rule 402, which permits admission of only relevant evidence." *Id.* ¶ 19. Last, the court must analyze the evidence in light of rule 403 to assess whether its probative value is substantially outweighed by the risk of unfair prejudice to the defendant. *See id.* ¶ 20.

¶ 30 We review the trial court's decision to admit evidence pursuant to rule 404(b) under an abuse of discretion standard. *See id.* ¶ 16. In performing that analysis, we "review the record to determine whether the admission of other bad acts evidence was scrupulously examined by the trial judge in the proper exercise of that discretion." *Id.* (internal quotation marks omitted).[6]

6. In *State v. Nelson–Waggoner*, 2000 UT 59, 6 P.3d 1120, the Utah Supreme Court reaffirmed its departure from its approach in past decisions to undertake the "close review" of the admission of bad acts evidence under a "limited deference" standard. *Id.* ¶ 16 & n. 5.

7. On appeal, Marchet also argues that rule 412 of the Utah Rules of Evidence, which prohibits a defendant from bringing in evidence of the al-

## A. Noncharacter Purpose

¶ 31 The State argued that the admission of M.P.'s and J.C.'s testimonies was proper for purposes of proving (1) that Marchet intended to rape B.F.; (2) that he had a specific plan, scheme, or modus operandi; (3) that his actions were not the result of a mistake or accident; and (4) that B.F. did not consent. At trial, the court instructed the jurors that they could consider testimony from M.P. and J.C. in making a determination as to "whether or not B[.F.] . . . consented to sexual intercourse." Marchet claims that the admission of that testimony constituted prejudicial error.[7] Although we are sympathetic to Marchet's concerns about the impact of M.P.'s and J.C.'s testimonies, we hold that this evidence was "scrupulously examined by the trial judge in the proper exercise of [his] discretion." *Id.* ¶ 16 (internal quotation marks omitted).

¶ 32 Rule 404(b) of the Utah Rules of Evidence specifically identifies intent, plan, and absence of mistake or accident as proper noncharacter purposes justifying the admission of bad acts evidence. *See* Utah R. Evid. 404(b). The Utah Supreme Court considered the proper application of rule 404(b) under facts similar to those present here in *State v. Nelson–Waggoner*, 2000 UT 59, 6 P.3d 1120. There, the defendant was accused of raping several women; the charges were tried separately. *See id.* ¶ 2.

¶ 33 At *Nelson–Waggoner's* first trial, the State moved to admit the testimony of his other accusers for the purpose of demonstrating lack of consent. *See id.* ¶ 3. The State identified ten similarities among the alleged rapes, including that the defendant invited each woman to his dorm room and raped her there by "forcing [the woman's] legs over his shoulders [and] bending her body in half so her knees were near her head

leged victim's sexual behavior with third persons, *see* Utah R. Evid. 412, should likewise prevent the State from presenting evidence of the defendant's sexual activities with third parties. However, this issue was not preserved in the trial court, and we do not consider it further. *See generally* Utah R.App. P. 24(a)(5)(A) (requiring citation to the record showing an issue was preserved in the trial court).

in a confining position that hurt and made it difficult for her to breathe or cry out for help." *Id.* The trial court denied the State's motion in the first trial, and the defendant was acquitted. *See id.* ¶ 4.

¶ 34 Prior to the defendant's second trial, rule 404(b) was clarified and amended [8] and the State again moved to admit evidence from the defendant's other accusers. *See id.* ¶ 5. The trial court held that the evidence was admissible for purposes of demonstrating the defendant's modus operandi and the accuser's lack of consent, "so long as each victim's testimony met six of the ten factual similarities" the State had identified. *Id.* Ultimately, two of the other women were permitted to testify at the second trial, *see id.* ¶ 6, and the defendant was convicted, *see id.* ¶ 14.

¶ 35 On appeal, the Utah Supreme Court upheld the trial court's ruling. *See id.* ¶ 25. In doing so, the supreme court noted that although it "is not conclusive proof that the [alleged victim] did not consent," bad acts evidence "is both relevant and material to the issue of consent and therefore properly admissible," "especially . . . when a defendant allegedly obviates the victim's consent in a strikingly similar manner in several alleged rapes." *Id.* ¶ 24 (internal quotation marks omitted). The supreme court concluded that the extrinsic evidence "laid out a pattern of behavior" that was consistent with the defendant's behavior toward his accuser. *Id.* ¶ 25. Furthermore, the distinctive sexual position common in each of the alleged rapes "suggest[ed] that the women did not consent to [the] defendant's pattern of behavior—including intercourse—while he held them in th[at] position." *Id.*

¶ 36 Here, in granting the State's motion, the trial court commented, "[T]his is very close to *Nelson–Waggoner.* . . . I think I would be deviating substantially from the law set forth by our Supreme Court in 2000 if I do not allow one or two of these witnesses." Marchet argues that his case can be distinguished from *Nelson–Waggoner* because there the distinctive sexual position itself was indicative of the lack of consent. He contends that the same is not true in this case and that therefore, the trial court's reliance on *Nelson–Waggoner* was misplaced.

¶ 37 We agree with Marchet that *State v. Nelson–Waggoner,* 2000 UT 59, 6 P.3d 1120, is not so factually identical as to "compel the admission of the extrinsic crime evidence in this case." There is nothing so unusual or so inherently uncomfortable about the sexual position described by Marchet's accusers that infers lack of consent standing alone. However, we also do not read *Nelson–Waggoner* as compelling the exclusion of bad acts evidence in the absence of such a unique position. While the supreme court relied heavily on the unusual and uncomfortable sexual position described by *Nelson–Waggoner's* accusers in affirming the trial court's decision to admit the testimony, *see id.* ¶ 25 ("That defendant engaged in this distinctive behavior with both [the victim] and the two witnesses, . . . makes this evidence probative as to the issue of consent."), it did not limit the admission of bad acts evidence to cases involving a distinctly uncomfortable sexual position.

¶ 38 Rather, the *Nelson–Waggoner* court explained that the traditional assumption that evidence of other rapes was not probative had changed so that, more recently, this type of evidence "has been admitted for the noncharacter purpose of proving the element of lack of consent in certain rape trials." *Id.* ¶ 24. The supreme court further explained, "This is especially true when a defendant allegedly obviates the victim's consent in a strikingly similar manner in several alleged rapes." *Id.* Applying this modern approach, the supreme court referred to the defendant's consistent pattern of behavior de-

---

8. The February 11, 1998 amendment to rule 404(b) of the Utah Rules of Evidence rejected the judicially-created presumption articulated in *State v. Doporto,* 935 P.2d 484 (Utah 1997), that bad acts evidence was inadmissible unless the trial court made additional findings, *see id.* at 490 (superseded by Utah R. Evid. 404(b) (as amended)); *see also State v. Decorso,* 1999 UT 57, ¶ 13, 993 P.2d 837 (acknowledging that the amendment to rule 404(b) served to abandon additional requirements), and clarified that extrinsic evidence must meet the requirements of rules 402 and 403 of the Utah Rules of Evidence. *See Nelson–Waggoner,* 2000 UT 59, ¶ 5 nn. 2–3, 6 P.3d 1120.

scribed by each of his accusers. *See id.* ¶ 25. Although the supreme court found the evidence of the distinctive sexual position compelling on the issue of lack of consent, there is nothing in the decision that suggests that the consistent pattern of behavior employed by a defendant must always include a distinctive sexual position. Instead, the supreme court held that the trial court must scrupulously review the evidence to determine whether the evidence of other bad acts sets forth a pattern of behavior consistent with the pattern of behavior the defendant engaged in with his present accuser to obviate consent. *See id.* ¶¶ 16, 25. If the trial court engages in a scrupulous examination, its decision will be upheld unless the trial court exceeds its discretion. *See id.* ¶ 16.

¶ 39 In this case, the trial court carefully compared the testimony of each woman, finding a pattern of behavior detailed by M.P. and J.C. that it viewed as consistent with Marchet's actions toward B.F. Before granting the State's motion, the trial court heard or reviewed testimony from each witness. It first identified nine factual similarities among their accounts and then further refined its analysis to isolate the behaviors it found particularly probative of the issue of consent. Those commonalities include the escalation in the intensity of Marchet's sexual advances coupled with his size and strength, forceful removal of the women's clothing, and penetration from behind during the sexual encounter. Although the trial court contemplated the likelihood that "these women were all consenting to the same sex and the same position," we see no indication that the trial court relied on the common sexual position as implicitly suggestive of nonconsent by itself. Instead, viewing the evidence cumulatively, the trial court found a pattern of consistent behavior by Marchet that obviated each woman's consent.

¶ 40 After scrupulously examining the bad acts evidence, the trial court concluded that it was offered for the noncharacter purpose of proving lack of consent.[9] We hold that the trial court did not exceed its discretion in reaching that conclusion.

## B. Relevance Under Rule 402

¶ 41 Bad acts evidence is subject to a relevance analysis under rule 402 of the Utah Rules of Evidence. *See id.* ¶ 19. Rule 402 permits the admission of relevant evidence, *see* Utah R. Evid. 402, while rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *id.* R. 401. The Utah Supreme Court has explained, "[U]nless the other crimes evidence tends to prove some fact that is material to the crime charged—other than the defendant's propensity to commit crime—it is irrelevant and should be excluded by the court pursuant to rule 402." *State v. Decorso,* 1999 UT 57, ¶ 22, 993 P.2d 837.

¶ 42 In *State v. Nelson–Waggoner,* 2000 UT 59, 6 P.3d 1120, the supreme court held that the "evidence of [the] defendant's bad acts was relevant to whether the alleged victim consented to having sexual intercourse." *Id.* ¶ 27. As in *Nelson–Waggoner,* Marchet admitted that he and his accuser had sexual intercourse, making consent the only contested element of the crime charged. *See* Utah Code Ann. § 76–5–402 (2008) ("A person commits rape when the actor has sexual intercourse with another person without the victim's consent."); *see also Nelson–Waggoner,* 2000 UT 59, ¶ 27, 6 P.3d 1120 (stating that "[consent] was the only issue at trial, since [the] defendant admitted to having sexual intercourse with [the victim]" (emphasis omitted)). Because the testimonies of M.P. and J.C. had some tendency to make the existence of B.F.'s consent "more probable or less probable than it would be without the evidence," Utah R. Evid. 401, they were

9. We do not agree with Marchet that the trial court abdicated its role as the arbiter of the admissibility question by blind adherence to *Nelson–Waggoner.* Although the trial court expressed concern about the impact of the bad acts evidence in light of its conclusion that the supreme court's decision was controlling, it engaged in precisely the analysis required. Indeed, the trial court excluded the testimony of N.R. and only admitted M.P.'s and J.C.'s testimonies after multiple hearings and careful comparison of the commonalities between their allegations and those of B.F.

relevant to the issue of consent, *see id.* R. 402.

## C.  Rule 403 Analysis

¶ 43  Finally, we must consider whether the trial court exceeded its discretion in concluding that the testimonies from M.P. and J.C. were admissible under rule 403 of the Utah Rules of Evidence.  Rule 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.* R. 403.

¶ 44  "Rule 403 does not require a trial court to dismiss all prejudicial evidence because '[a]ll effective evidence is prejudicial in the sense of being damaging to the party against whom it is offered.'" *State v. Killpack,* 2008 UT 49, ¶ 53, 191 P.3d 17 (alteration in original) (quoting *Woods v. Zeluff,* 2007 UT App 84, ¶ 7, 158 P.3d 552).  However, the trial court must take special care in admitting evidence of a defendant's other bad acts.  In *State v. Shickles,* 760 P.2d 291 (Utah 1988), the Utah Supreme Court identified guiding factors to be considered in balancing the probative value of bad acts evidence against "[i]ts tendency to lead the finder of fact to an improper basis for decision." *Id.* at 295.  The *Shickles* factors include

> "[1]  the strength of the evidence as to the commission of the other crime, [2] the similarities between the crimes, [3] the interval of time that has elapsed between the crimes, [4] the need for the evidence, [5] the efficacy of alternative proof, and [6] the degree to which the evidence probably will rouse the jury to overmastering hostility."

*Id.* at 295–96 (quoting E. Cleary, *McCormick on Evidence* § 190, at 565 (3d ed.1984)).  After considering each of these *Shickles* factors, the trial court concluded that the probative value of the evidence was sufficient to overcome any unfair prejudice to Marchet.

¶ 45  First, the strength of the evidence was great.  Both M.P. and J.C. testified in person at trial and were available for cross-examination.[10]  Second, as discussed above, the trial court scrutinized the similarities among those allegations.  Although the State sought the admission of testimony from three of Marchet's other accusers, the court ultimately concluded that only the events detailed by M.P. and J.C. could be presented to the jury.  Third, the trial court considered the time between the alleged rapes.  The court determined that despite B.F.'s testimony that Marchet raped her more than a year prior to M.P. and more than two years prior to J.C., the evidence was sufficiently proximate to warrant its admission.[11]  *Cf. State v. Decorso,* 1999 UT 57, ¶ 32, 993 P.2d 837 (describing a seven-month interval between alleged crimes as "relatively short"); *State v. O'Neil,* 848 P.2d 694, 701 (Utah Ct.App.1993) (calling a three-year span between the defendant's earlier conviction and the alleged crime "a short period of time").  Fourth, the court considered the need for the extrinsic evidence where, without the testimonies of M.P. and J.C., the jury would be left to resolve "a contest of credibility" between Marchet and B.F. *See generally Nelson–Waggoner,* 2000 UT 59, ¶ 30, 6 P.3d 1120 (stating that issues of credibility created a need for bad acts evidence).  Fifth, the only alternative proof of the central issue of consent was "the directly conflicting testimonies," *id.,* of B.F. and Marchet.

¶ 46  Finally, the trial court determined that it could minimize the possibility that the evidence would "rouse the jury to overmastering hostility." *See Shickles,* 760 P.2d at 296.  When Marchet's trial counsel bluntly expressed his concern about "putting on a bunch of white Mormon girls to cry in front of a jury about a black man," the court agreed that the potential for "overmastering

---

10.  Marchet's trial counsel elected not to cross-examine these witnesses.

11.  B.F. claimed that she was raped in October 2002.  M.P. testified that Marchet raped her in July 2004, and J.C. testified that her rape occurred in March 2005.  Although the trial court did not allow N.R. to testify at trial, the court noted her testimony that she was also raped in October or November 2002 while considering the timing of Marchet's alleged crimes.

hostility ... [was] a huge problem." However, the trial court concluded that it could "mitigate any unfair prejudice" by crafting a "very careful [jury] questionnaire on attitudes [and] race" and by "instruct[ing] the jury about what [the testimonies of M.P. and J.C. could] be used for." Indeed, throughout its consideration of the State's request to admit testimony from other alleged victims, the trial court exhibited a heightened awareness of the potential impact of such testimony, the need for it to be similar and relevant, and a commitment to select and instruct the jury so as to minimize any unfair prejudice to Marchet. *See generally* Utah R. Evid. 403 (allowing for the exclusion of relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice").

¶ 47 At trial, the court instructed the jury as follows:

> You have heard evidence from two witnesses, J[.C.] and M[.P.], of other sexual assaults allegedly committed by the defendant, Mr. Marchet.[ ] You are instructed that Mr. Marchet was previously acquitted by a jury of the alleged offense against [J.C.] You are further instructed that Mr. Marchet has not been charged with an offense involving M[.P.], and he is presumed innocent of any such offense.

> You may use the evidence offered by the two witnesses only to help you decide whether Azlen Marchet had non-consensual sexual intercourse with B[.F.], the alleged victim in this case, and for no other purpose. The law does not allow you to convict Mr. Marchet or to punish him simply because you believe he may have done things, even bad things, not specifically charged as crimes in this case. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he has acted in this case in conformity with that character. The evidence may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*See generally State v. Nelson–Waggoner*, 2000 UT 59, ¶ 9, 6 P.3d 1120 (quoting a similar jury instruction).

¶ 48 During deliberations, the jury indicated that it found the second paragraph of the instruction confusing. After discussing the jury's inquiry with counsel, the court gave a supplemental instruction, which clarified,

> 1. The evidence of [J.C.] and/or [M.P.] may be used by you to assist your determination whether or not B[.F.] consented to sexual intercourse. The last (fourth[) ] sentence[ ] suggests some of the factors on which that testimony may bear as you consider that question, such as defendant's plan, his motive, his intent, etc. Any one or more, or none, of the factors may be established by the evidence. That is solely for you to decide.
> 2. The second sentence emphasizes that you may not consider any question of Mr. Marchet's legal responsibility for any alleged offense against [J.C.] or [M.P.] There are no charges against Mr. Marchet with respect to those witnesses today, and it would be a violation of your duty for you to make any decision that punishes him for any thing you may believe he did with either of these two women.
> 3. The third sentence emphasizes that you may draw no conclusions from the evidence regarding Mr. Marchet's character, and even if you harbor some conclusions about his character, it would be a violation of your duty to decide this case based on a conclusion that Mr. Marchet acted in this case in conformity with that character. In other words, you must decide this case based on the defendant's actions as determined by you, and not on any conclusion regarding his character; for example, you may not convict Mr. Marchet on the basis that you may find him to be a bad person.

Marchet argues that this supplementary instruction effectively gave jurors "carte blanche to consider the evidence for virtually any purpose." We disagree.

¶ 49 The initial instruction emphasized that the testimonies of M.P. and J.C. could be used for the sole purpose of determining

whether B.F. consented to sexual intercourse. The jurors were expressly instructed to avoid making any determination of Marchet's guilt based on their beliefs about his character or the likelihood that he committed the offenses alleged by M.P. and J.C. The jurors were also correctly informed that they could consider other 404(b) purposes as they related specifically to the issue of consent. We are not convinced that the initial instruction "permitt[ed] virtually unlimited use of the extrinsic crime evidence."

¶ 50 Marchet further argues that the use of the abbreviation "etc." in the trial court's clarifying instruction removed all limitations from the jury's use of the bad acts evidence. We disagree. The clarifying instruction states in paragraph one: "The last (fourth[) ] sentence[ of the original instruction] suggests some of the factors on which that testimony may bear as you consider that question, such as defendant's plan, his motive, his intent, etc." While we agree that it would have been better not to include "etc." in the supplemental instruction, it was not error under these circumstances. Had the original instruction included a list of proper noncharacter purposes ending with etcetera, we might agree with Marchet that the jury's focus had not been properly limited. In this case, however, the clarifying instruction was discussing the original instruction and etcetera is a reference to the remainder of the list of the specific noncharacter purposes contained in the "last (fourth[) ] sentence[ ]" of that prior instruction.[12] Considering the instructions as a whole, we conclude that the trial court properly instructed the jury on the limits to its consideration of the bad acts evidence.

¶ 51 The trial court carefully considered the probative value of the evidence under each of the *Shickles* factors, *see State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988). Furthermore, it instructed the jury as to the limited purpose for which the evidence was being offered. Therefore, admission of the bad acts evidence was proper under rule 403 and the trial court did not err in admitting the evidence under rule 404(b) of the Utah Rules of Evidence.

## CONCLUSION

¶ 52 The trial court properly instructed the jury as to the elements of the crime of rape and the proper men's rea to convict Marchet for the crime. Marchet's trial counsel did not render ineffective assistance by failing to request a mistake of fact instruction. The trial court scrupulously examined the bad acts evidence and acted within its discretion in admitting it.

¶ 53 Affirmed.

¶ 54 WE CONCUR: WILLIAM A. THORNE JR., Associate Presiding Judge and RUSSELL W. BENCH, Judge.

---

12. The last sentence of the original jury instruction states, "The evidence may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."