IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | OPINION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20090349-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (July 19, 2012) |
| Azlen Adieu Farquiot Marchet, | ) | |
| | ) | 2012 UT App 197 |
| Defendant and Appellant. | ) | |

-----

Third District, Salt Lake Department, 071905648
The Honorable Vernice Trease

Attorneys:    Herschel Bullen, Salt Lake City, for Appellant
              Mark L. Shurtleff and Jeanne B. Inouye, Salt Lake City, for Appellee

-----

Before Judges Orme, Davis, and Roth.

DAVIS, Judge:

¶1      Azlen Adieu Farquiot Marchet appeals from a conviction for rape, a first degree felony, *see* Utah Code Ann. § 76-5-402 (2008).[1]  We affirm.

---

[1]Because the portions of the Utah Code relevant to this opinion have not changed from the version of the code in effect at the time of the incident at issue, we cite the current version of the Utah Code for the convenience of the reader.

BACKGROUND

¶2 M.P. met Marchet as she and a friend were sitting outside a dance club around 12:30 or 1:00 a.m. on July 1, 2004.[2] Marchet, who is between six feet six inches and six feet eight inches tall and at the time weighed around 275 pounds, introduced himself as Cody and invited M.P., who is around five feet six inches tall and at the time weighed around 135 pounds, and her friend to watch a movie at his home. The women declined. Marchet remained "[v]ery persistent" in his request that they watch a movie at his house and "[w]ouldn't leave it alone. [He j]ust kept asking" and "wasn't going to take no for an answer." M.P. finally agreed to his invitation but "told him numerous times" that if he was "looking for action, [he had] the wrong girl." Marchet "reassure[d M.P.] . . . that that's not what was going to happen."

¶3 Once at Marchet's condominium, M.P. set her purse and phone on the first-floor coffee table. Marchet led M.P. upstairs to his bedroom, indicating that that was where they would watch a movie, and then went into the attached bathroom to change his clothes without shutting the door. He lay down on the bed, wearing only silk pajama bottoms, and asked M.P. to cuddle with him. She declined, but Marchet persisted until she finally gave in and leaned stiffly toward him. Marchet then attempted to unbutton M.P.'s pants. M.P. repeatedly asked him to stop, and Marchet's actions became "more forceful and more aggressive." Marchet pulled down M.P.'s pants, exposing her rear end, and penetrated her vaginally while positioned behind her. Realizing that Marchet "wasn't going to stop," M.P. asked him to wear a condom to at least ease her concerns about contracting a disease or getting pregnant. Marchet complied, leaving M.P. alone in his bedroom for a few minutes while he went downstairs to get a condom. M.P. testified that she did not attempt to flee at that point because she did not believe she had enough time to "pull [her] pants up, get out of his room, go down the stairs, across the living room," get her purse and keys from the coffee table, go "down three flights of stairs and cross the parking lot" to her car, as well as "get past a 275-pound man." Marchet returned with a condom before M.P. could even finish buttoning her pants and penetrated her a second time, also from behind. Then, Marchet digitally penetrated her to retrieve the condom, which had fallen off. When Marchet finished, M.P. was shaking

---

[2]"When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly." *State v. Heaps*, 2000 UT 5, ¶ 2, 999 P.2d 565.

from pain and distress, but she led Marchet to believe she was just cold. Marchet forced her to cuddle again and then proceeded to penetrate her for the fourth and final time.

¶4     M.P. cried after the last penetration and lied and told Marchet she was crying because she had not had sex since her husband had died a few years before. She testified that she "was in survivor mode" and "didn't want him to . . . think [she] was going to go to the police," fearing that giving him that impression would jeopardize any likelihood that she would "get out of [there] alive" and return to her children. After the last penetration, they went downstairs and had a personal conversation for twenty to thirty minutes because M.P. believed she had "to make this guy think that [she was] not going to the police." M.P. gathered her purse and commented that her cell phone was not on the coffee table where she had left it, at which point Marchet retrieved it from behind a pillow on the couch. Marchet then walked M.P. to the door and allowed her to leave without further incident.

¶5     In support of the charges for M.P.'s rape, the State was permitted to admit testimony of two other women who claimed that they were also raped by Marchet. The trial court determined that the witnesses' testimony was probative of Marchet's "intent, consent or lack thereof, plan or specific scheme and lack of mistake or accident." After the first of these witnesses (Witness) testified about her experience of being raped by Marchet, which she delayed reporting for two years, defense counsel attempted to discredit her, asking, "And then you saw him on a number of occasions after that, didn't you?" Witness responded simply, stating, "A few times, yes." In response to that exchange, the State was permitted to elicit testimony from Witness elaborating on her subsequent interactions with Marchet. Witness clarified that she had seen Marchet out at a club a couple of times after the incident, did not interact with him, and would leave after seeing him there. On one occasion, however, Witness interrupted a conversation Marchet was having with some other girls to warn them that they "probably don't want to talk to him" because "he's a rapist." Witness testified that she then walked away and Marchet followed her and threatened her, saying, "'You better F'ing watch your back.'" She saw Marchet one more time at a club after that incident. This time, Witness told one of her male friends who was at the club with her that Marchet had raped her. Her male friend approached Marchet, it appeared a fight was going to break out, and Witness left the club with a female friend. Marchet came running up to Witness, knocked Witness and her female friend to the ground, and proceeded to kick the female friend in the ribs. Witness testified that as she attempted to

help her friend, Marchet looked at Witness and said, "'I'm going to F'ing kill you,'" grabbed a glass beer bottle, and smashed it over Witness's head. Witness received six stitches at the hospital and at that point reported her rape by Marchet to the police.[3]

¶6      Marchet also testified, explaining that he believed his encounters with M.P. and the two witnesses were entirely consensual, that M.P.'s account was not accurate, that M.P. participated in the intercourse, did not say no, and expressed hesitation only about having a "one-night stand." Marchet described M.P.'s attitude as having changed while the two were chatting after intercourse once she realized that Marchet knew her friend Miguel, whom Marchet believed was her boyfriend.

¶7      At the close of trial, Marchet requested an ignorance or mistake-of-fact jury instruction to support his defense that he believed M.P. consented. The trial court denied his proposed instruction, ruling that there was no basis for it in the evidence presented. The jury subsequently found Marchet guilty of raping M.P.


ISSUES AND STANDARDS OF REVIEW

¶8      Marchet appeals, arguing that the trial court erred in admitting evidence of the assault against Witness. "We review a trial court's decision to admit evidence under rule 404(b) [of the Utah Rules of Evidence] for an abuse of discretion." *State v. Ferguson*, 2011 UT App 77, ¶ 10, 250 P.3d 89, *cert. denied*, 262 P.3d 1187 (Utah 2011).

¶9      Marchet also argues that his trial counsel provided ineffective assistance in opening the door to the assault evidence. "Where, as here, a claim of ineffective assistance of counsel is raised for the first time on appeal without a prior evidentiary hearing, it presents a question of law." *State v. Bryant*, 965 P.2d 539, 542 (Utah Ct. App. 1998).

---

[3]For simplicity, we refer to Witness's testimony of the assault with a beer bottle and the surrounding circumstances as the "assault evidence."

¶10    Last, Marchet argues that the trial court's refusal to give Marchet's requested jury instruction on ignorance or mistake constitutes reversible error.[4]  "Whether the trial court's refusal to give a proposed jury instruction constitutes error is a question of law, which we review for correctness."  *State v. Hamilton*, 827 P.2d 232, 238 (Utah 1992).


ANALYSIS

I.  Assault Evidence

¶11    Marchet argues that the assault evidence "was highly inflammatory and prejudicial, not probative of any necessary element of the alleged crime against M.P., and suggest[s] a decision on . . . an improper basis (hatred, contempt, retribution or horror)," in contravention of rules 402, 403, and 404(b) of the Utah Rules of Evidence. *See generally* Utah R. Evid. 402 ("Irrelevant evidence is not admissible."); *id.* R. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."); *id.* R. 404(b) (excluding evidence of prior crimes, wrongs, or bad acts except for noncharacter "purpose[s], such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident").  Marchet contends that "the volatility inherent in rape cases" rendered the trial court's error in admitting the assault evidence unfairly prejudicial because "[n]o rational juror could help but be

---

[4]Marchet presents a fourth argument, challenging in conclusory fashion the trial court's admission of the two witnesses' testimony about prior sexual encounters. Marchet admits that this argument "is advanced in the interest of challenging existing law and preserving this issue for such future proceedings as may occur."  The "existing law" he seeks to challenge is from *State v. Marchet* (*Marchet I*), 2009 UT App 262, 219 P.3d 75, in which Marchet was convicted for the rape of Witness, *see id.* ¶¶ 1-2.  We decline this invitation to revisit our earlier decision in *Marchet I*.  *See generally State v. Tenorio*, 2007 UT App 92, ¶ 9, 156 P.3d 854 ("[A] court will overrule its own precedent in the limited circumstances where it is clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent . . . ." (internal quotation marks omitted)).

impressed after hearing such evidence, that Marchet must simply be a bad man." We disagree.

¶12    Assuming, without deciding, that the trial court erroneously admitted the assault evidence, we do not believe that the error warrants reversal of the jury verdict. "[We] will not overturn a jury verdict for the admission of improper evidence if the admission of the evidence did not reasonably [a]ffect the likelihood of a different verdict." *State v. Johnson*, 2007 UT App 184, ¶ 34, 163 P.3d 695 (alterations in original) (internal quotation marks omitted).

¶13    Here, the issue at trial essentially came down to whether M.P. consented to having intercourse with Marchet, not whether Marchet believed she consented. M.P. testified that she did not consent but eventually stopped protesting out of fear for her own safety given Marchet's size and because she is a widow with children at home. M.P. claims that she shared personal details of her life with Marchet after the rape as a means of quelling any hesitation he may have had about letting her go. Marchet testified that he believed M.P. had consented. Thus, to bolster M.P.'s credibility, the State introduced the testimony of the two witnesses who claimed they were also raped by Marchet in strikingly similar fashions. Testimony of these similarities was important to suggest "(1) that Marchet intended to rape [M.P.]; (2) that he had a specific plan, scheme, or modus operandi; (3) that his actions were not the result of a mistake or accident; and (4) that [M.P.] did not consent." *Marchet I*, 2009 UT App 262, ¶ 31, 219 P.3d 75; *see also State v. Nelson-Waggoner*, 2000 UT 59, ¶¶ 24-25, 6 P.3d 1120 (explaining that bad acts evidence may be admitted "for the noncharacter purpose of proving the element of lack of consent in certain rape trials[,] . . . especially . . . when a defendant allegedly obviates the victim's consent in a strikingly similar manner in several alleged rapes," and that such modus operandi evidence may "la[y] out a pattern of behavior . . . consistent with the pattern of behavior in which [the defendant] engaged with [the victim]" (citation omitted)). The assault evidence was introduced to bolster Witness's credibility after defense counsel asked Witness a question that insinuated that she and Marchet had a friendly relationship after Witness's claimed rape. The assault evidence, which is only tangentially related to the ultimate issue of whether M.P. consented, explained the actual contexts in which Witness had seen Marchet after the rape and explained why she ultimately reported the rape.

¶14    The potential harmful import of the assault evidence was minimized by defense counsel's closing argument in which he suggested that Witness's delayed report of the

rape demonstrated that she was not actually raped and that she instead made a false accusation in retaliation for the assault and for feeling "scorned," "used, degraded, . . . dirty," and humiliated for having made the decision to have sex with Marchet. Additionally, jury instruction thirteen, although primarily aimed at instructing the jury in how to evaluate the two witnesses' testimonies admitted under rule 404(b), also reduced any harmful effect the admission of the assault evidence may have had.  The instruction stated,

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. . . .  You may consider the testimony of [the two witnesses] only for the purpose of deciding (1) whether or not the defendant intended to rape [M.P.]; (2) whether or not he had a plan, scheme, or other modus operandi with regard to [M.P.]; or (3) whether or not [M.P.] consented to the sexual intercourse.

Thus, any prejudicial effect the assault evidence may have had was tempered by this instruction and the statements in defense counsel's closing argument, and was otherwise overshadowed by all of the other evidence admitted that supports the jury's finding that M.P. did not consent.  *See Johnson*, 2007 UT App 184, ¶ 34.

## II.  Ineffective Assistance of Counsel

¶15    Next, Marchet argues that his trial counsel was ineffective for asking Witness the question that "opened the door" for the State to elicit the assault evidence testimony. To prove ineffective assistance, Marchet must "demonstrate that counsel's performance was deficient, in that it fell below an objective standard of reasonable professional judgment," and "that counsel's deficient performance was prejudicial—i.e., that it affected the outcome of the case." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)).  To succeed on an ineffectiveness claim, Marchet must demonstrate both that trial counsel was deficient and that counsel's deficiency was prejudicial; failure on either prong defeats his claim.  *See State v. Bair*, 2012 UT App 106, ¶ 49, 275 P.3d 1050 ("[B]ecause both deficiency and prejudice must be shown, a reviewing court can dispose of an ineffectiveness claim on either ground." (internal quotation marks omitted)).  Consequently, because we have already

determined that the admission of the assault evidence was harmless, Marchet cannot prove that trial counsel's performance, even if deficient, was prejudicial.

## III. Jury Instruction

¶16    Last, Marchet argues that the trial court erroneously rejected his request for a jury instruction on ignorance or mistake. The trial court based its denial of Marchet's requested instruction on its determination that "there [was] not . . . sufficient evidence presented during the trial to merit such an instruction." Marchet also contends that the instructions given, in particular jury instruction sixteen, "did not require the jury to find *any* mental state on his part with regard to [M.P.]'s consent or lack thereof[ b]ecause the jury was never informed of the State's burden to establish Marchet's *mens rea* with regard to consent."

¶17    We affirm the trial court's denial of Marchet's requested mistake-of-fact instruction because "the jury instructions as a whole fairly instruct[ed] the jury on the applicable law." *See Normandeau v. Hanson Equip., Inc.*, 2007 UT App 382, ¶ 16, 174 P.3d 1 (internal quotation marks omitted) ("[R]eversible error does not arise merely because one jury instruction, standing alone, is not as accurate as it might have been."), *rev'd on other grounds*, 2009 UT 44, 215 P.3d 152; *see also Okelberry v. West Daniels Land Ass'n*, 2005 UT App 327, ¶ 11, 120 P.3d 34 ("It is well established that we may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action . . . ." (internal quotation marks omitted)). "A party is entitled to have the jury instructed on its theory of the case if competent evidence is presented at trial to support its theory," although a party "is not entitled to have the jury instructed with any particular wording." *Normandeau*, 2007 UT App 382, ¶ 16. Thus, "[a]s long as the instructions, read as a whole, fairly instruct the jury on applicable law, it is not error to refuse a particular instruction." *Id.* Furthermore, "[a]lthough a criminal defendant is entitled to have the jury instructed on his theory of the crime if there is any basis in the evidence to support that theory, jury instructions should not incorrectly or misleadingly state the law." *State v. Larsen*, 828 P.2d 487, 495 (Utah Ct. App. 1992), *aff'd*, 865 P.2d 1355 (Utah 1993).

¶18    Marchet's requested jury instruction stated, "You shall find the defendant not guilty if you believe from the evidence that the defendant was ignorant or mistaken in his belief that [M.P.] consented to sexual intercourse," and cited Utah Code section 76-2-

304(1), *see* Utah Code Ann. § 76-2-304(1) (2008) ("Unless otherwise provided, ignorance or mistake of fact which disproves the culpable mental state is a defense to any prosecution for that crime."). Instruction sixteen states,

> Before you can convict the defendant, Azlen Marchet, of the offense of Rape, . . . you must find from all of the evidence and beyond a reasonable doubt each and every one of the following elements of that offense:
>
> 1 That the defendant, Azlen Marchet, had sexual intercourse with [M.P.]; and
>
> 2 That said act of intercourse was without the consent of [M.P.]; and
>
> 3 That the defendant acted intentionally or knowingly or recklessly.

The trial court also gave the jury instructions that further explained consent, reasonable doubt, and the three enumerated mental states.

¶19 "Contrary to Marchet's assertions, Instruction [sixteen] accurately identified each element of the crime of rape and correctly stated the applicable mental state." *See Marchet I*, 2009 UT App 262, ¶ 22, 219 P.3d 75 (involving a jury instruction nearly identical to instruction sixteen given in this case). The other instructions given to the jury indicated that the State "has the burden of proving the defendant guilty beyond a reasonable doubt" and elaborated that this burden includes the burden of "prov[ing] the existence of the required mental state beyond a reasonable doubt." Read as a whole, the jury instructions "communicated to the jury that Marchet was guilty of rape not simply if he knowingly, intentionally, or recklessly had sexual intercourse with [M.P.], but only if he knowingly, intentionally, or recklessly did so without [M.P.]'s consent."[5] *See id*. ¶ 23. To succeed on a mistake-of-fact defense, Marchet would have to demonstrate either that M.P. actually consented or that there was a reasonable doubt as

---

[5]This is not to say that the jury instruction employed could not be adjusted to more clearly communicate the mental state element.

to whether M.P. consented.  However, had the jury found either of those factual situations in this case, the instructions provided informed them that they must acquit Marchet because the State did not meet its burden of proving every element of the crime beyond a reasonable doubt.  In other words, the arguments and evidence supporting Marchet's mistake-of-fact defense also support an acquittal under the jury instructions provided.  Accordingly, the instructions properly informed the jury as to the elements and mental state of the crime and allowed the jury to consider Marchet's theory of the case.[6]  *Cf. id.* ¶ 27 ("Assuming that the jurors resolved the contest of credibility in favor of Marchet, there would be no need for a mistake of fact instruction

---

[6]The trial court, adopting language from California case law, also noted that Marchet's proposed mistake-of-fact instruction was inadequate because the instruction should have contained a subjective component that addressed whether Marchet "in good faith[,] albeit mistaken[ly,] believe[d] that the victim . . . consented," and an objective component that addressed "whether the defendant's mistake regarding consent was reasonable under the circumstances." *See People v. Williams*, 841 P.2d 961, 965 (Cal. 1992) ("The [mistake-of-fact defense as to a person's lack of consent to sexual intercourse] has two components, one subjective, and one objective.  The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse.  In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent.  In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances." (footnote omitted)).  It is unclear whether Utah law recognizes a mistake-of-fact defense in such a context. *See State v. Houston*, 2000 UT App 242, ¶ 6, 9 P.3d 188 (noting that the defendant was acquitted of rape (and other charges) and his primary defense at trial was that "he had 'a reasonable and good faith belief that [the complainant] voluntarily consented to engage in sexual intercourse,'" but not analyzing that issue).  Assuming Utah does recognize such a defense in rape cases, this "is not to say [that] an honest and reasonable mistake of fact instruction should not be given in the proper alleged rape case," but that such an instruction is not necessary here, where "the instructions as a whole adequately instruct on the issues." *See United States v. Lewis*, 6 M.J. 581, 586 (A.C.M.R. 1978) (per curiam).  In the proper case, it may be wise to consider the standards established by other jurisdictions, like California, when developing such a jury instruction.

and the use of one may have weakened his defense.  In contrast, if the jury believed [the complainant's] version of the facts, there is nothing in [the mistake of fact statute] that would allow Marchet to ignore the fact that [the complainant] put her clothes back on while he was out of the room and unambiguously indicated that she did not want to have sex with him."); *Normandeau*, 2007 UT App 382, ¶ 16.

CONCLUSION

¶20    Assuming, without deciding, that the assault evidence was improperly admitted at trial, the error was harmless.  Because Marchet was not prejudiced by the admission of the assault evidence, Marchet's claim of ineffective assistance of trial counsel fails. Last, because the jury instructions as a whole "fairly instruct[ed] the jury on applicable law," *see Normandeau*, 2007 UT App 382, ¶ 16, the trial court did not commit reversible error by rejecting Marchet's proposed instruction on ignorance or mistake.  Affirmed.


_____
James Z. Davis, Judge


-----


¶21    WE CONCUR:



_____
Gregory K. Orme, Judge



_____
Stephen L. Roth, Judge