2017 UT App 101

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DONALD R. REIGELSPERGER,
Appellant.

Opinion
No. 20140773-CA
Filed June 22, 2017

Third District Court, Silver Summit Department
The Honorable Todd M. Shaughnessy
No. 131500027

Ann M. Taliaferro and John K. Johnson, Attorneys
for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN concurred.

POHLMAN, Judge:

¶1 Donald R. Reigelsperger and his then-wife (Wife) were in the midst of divorce proceedings when he surprised her at her place of work, refused to allow her to leave, and engaged in sexual conduct with her without her consent. Following a jury trial, Reigelsperger was convicted of aggravated kidnapping and four sexual assault offenses. He appeals, asserting that the trial court should have suppressed the statements he made just prior to his arrest and that, in several respects, the jury instructions were plainly erroneous and resulted from ineffective assistance of counsel. We affirm.

BACKGROUND

*The Restraint and the Assaults*

¶2 Reigelsperger and Wife had been married for more than twenty-five years when, in October 2012, Wife informed him that she was ending their relationship.[1] Reigelsperger moved out, and from that time forward he and Wife had little contact. As a general rule they communicated only as necessary for purposes of their divorce proceedings and the property management business they owned, and they informed one another of the details of the business through text messages and voicemails.

¶3 In January 2013, Wife went to a client's home to complete projects that had occupied her time for the past several days. Reigelsperger had also worked at the home recently, but not during the preceding few weeks, as Wife preferred that they not be at a client's home at the same time. When Wife arrived and entered the home, she saw Reigelsperger. He was inside the home, standing a few feet from the entryway, and was holding a BB gun, which Wife mistook for a small handgun.[2]

¶4 Reigelsperger grabbed Wife's hand and tried to pull her into the house, saying, "[Y]ou are coming with me." Wife pulled back and grabbed the doorjamb. The door swung shut on her

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *Mackin v. State*, 2016 UT 47, ¶ 2 n.1, 387 P.3d 986 (citation and internal quotation marks omitted).

2. When police officers later arrived at the scene, they also mistook the BB gun for a handgun. They later inspected the gun and discovered that it was a BB gun.

finger, she screamed, and Reigelsperger released his grip. Once her finger was free, Wife stood in the entryway, crying. She pleaded with Reigelsperger to let her go, but she did not attempt to open the door again. With the gun still in hand, Reigelsperger told Wife she had to stay, and if she tried to escape, he might hit her "over the head with the gun" or "push [her] to the ground and hurt [her]."

¶5     Reigelsperger directed Wife to move to the large living area, where Wife saw a ladder and "a rope hanging from the high wooden ceiling rafter with a noose on it." Reigelsperger told Wife that she "need[ed] to sit in a chair and watch [him] hang [himself]" and that he might rape her. Reigelsperger also directed Wife to undress and get into a hot tub, which was in the living area. Wife did so, removing all of her clothing except her underwear. Reigelsperger, also wearing his underwear, followed her into the water. Initially, Wife did not know where Reigelsperger had put the gun, but she subsequently saw it "several feet away on the deck."

¶6     Reigelsperger pulled Wife toward him and told her to kiss him, but she turned her head. Reigelsperger fondled Wife's breasts until he pinched them and Wife said, "[O]uch." Reigelsperger touched Wife's genitals and also penetrated her anus before moving Wife to a bench inside the hot tub and instructing her to perform oral sex on him. She complied. Wife did not attempt to grab the gun, which was currently out of her and Reigelsperger's reach.

¶7     After Wife performed oral sex on Reigelsperger, he became "very emotional" and told her she could leave. Wife dressed, unintentionally putting her clothes on "inside out and backwards," and Reigelsperger commented, "[Y]ou had better hurry before I change my mind." Wife went to her car and left.

¶8     Once a short distance away, Wife called 911. Crying throughout the call, Wife reported that her "husband ha[d] a

gun" and "want[ed] to kill himself." When asked to repeat the purpose of her call, Wife again said, "My husband[] . . . has a gun and he said he's going to kill himself or hang himself and he just held me at [gunpoint] for an hour." The call was brief, and Wife did not go into detail regarding what had occurred at the home nor did she report being sexually assaulted.

¶9     Wife went to the police station where she reported being sexually assaulted, was interviewed, and was then escorted to a local hospital. At the hospital Wife underwent a physical exam, which included a swab of the inside of her mouth. Wife struggled to "really communicate" with the examining nurse, but again reported what had occurred between herself and Reigelsperger.

¶10    Meanwhile, back at the house, Reigelsperger had been attempting to reach Wife. Almost immediately after she left, Reigelsperger called Wife and left a voicemail message, saying, "[Y]ou're already on the phone. I hope [you're] not calling someone to make this situation escalated. I just committed a felony."

¶11    Shortly thereafter, police officers arrived at the house and took Reigelsperger into custody, not under suspicion of committing a crime, but based on the risk that he was "going to harm himself or someone else." Reigelsperger was taken in an ambulance to a nearby hospital. A police officer followed and, upon arriving at the hospital, filled out forms regarding Reigelsperger's involuntary admittance. The officer reported a substantial risk that Reigelsperger would harm himself unless taken into protective custody, and the officer indicated that he "wanted to be notified prior to the patient's discharge." Reigelsperger was subsequently transferred to the University Neuropsychiatric Institute (UNI).

¶12    That night Reigelsperger left another voicemail message for Wife, stating, "I'm sorry for my actions," "I treated you so

poorly," and "I'm so very sorry for offending you and intruding on your sexuality." Reigelsperger also sent a text message to another family member, stating, "I made [Wife] get in the hot tub with me, and I made her kiss me," and "I acted inappropriately towards her."

*The Interview at UNI and Other Statements by Reigelsperger*

¶13    Reigelsperger spent several days at UNI. Five days after he was admitted, two police detectives went to UNI to ask Reigelsperger for a DNA sample. One of the detectives (Detective) had been in "daily contact" with a UNI staff member, "hop[ing]" to be "told when [Reigelsperger] was going to be released" so she could arrest him at that time. Detective apparently believed, based on her communications with UNI staff, that Reigelsperger would be released the following day.

¶14    Although Detective brought a warrant for Reigelsperger's arrest, UNI staff initially refused to provide access to Reigelsperger or even to acknowledge his presence there. But the detectives were persistent and told UNI staff that they would be taking Reigelsperger into custody that day. They reached an understanding with UNI staff that they would obtain a DNA sample from Reigelsperger if he consented, and they would then arrest Reigelsperger and remove him from UNI.

¶15    The detectives were escorted to a fairly large room with a couch flanked by two chairs. The detectives sat down in the chairs and waited until UNI staff brought Reigelsperger to the room. Detective was not in uniform and her badge was not visible. The detective who accompanied her was wearing his informal police uniform and his badge and was carrying handcuffs. Both were unarmed.

¶16    Reigelsperger arrived and sat down on the couch. He was not restrained by the detectives or by UNI staff, and he was not "hooked up to any sort of medical equipment." Reigelsperger

was not told that he was under arrest, that the detectives had a warrant for his arrest, or that the detectives planned to remove him from UNI. Reigelsperger also was not told that he was a suspect in a crime, although he had learned from other sources that Wife had contacted the police and reported what had occurred.

¶17   Detective asked if Reigelsperger would provide a DNA sample, and he provided one. Reigelsperger then began talking as though he "wanted to get his side of the story out." Detective stopped him and informed him of at least some of his *Miranda* rights, but the recitation and explanation of Reigelsperger's *Miranda* rights were not recorded because the detectives' audio recorder had not yet been turned on.

¶18   Detective also provided Reigelsperger with a form entitled "Miranda Waiver." The form provided: "You have the right to remain silent. Anything you say may be used against you in court. You have the right [to] an attorney. If you cannot afford an attorney, one will be appointed free of charge." The form contained the additional language, "Do you understand these rights? Will you explain your side of the story? If so, please sign."

¶19   After Detective provided Reigelsperger with the form and discussed it with him, the audio recorder was turned on. Detective asked Reigelsperger if he wanted to keep talking with her, and Reigelsperger immediately indicated that he did and signed the form. He began telling the detectives about the day in question. Detective asked Reigelsperger several questions, which were largely about his divorce and living situation, his intent in going to the client's home on the day in question, and the events that occurred there. Reigelsperger talked at length without indicating any desire to cease speaking with the detectives or to stop answering their questions. The recorded interview lasted less than thirty minutes.

¶20    During the interview, Reigelsperger said his plan was to harm himself and for Wife to find him, but he had "no idea" Wife would be at the house that day. He recounted that when Wife arrived, she "freaked out," and he "[g]rabbed her by [the] arm." When asked if Wife had said "she wanted to leave, like leave the house" or "[g]et away from [him]," Reigelsperger replied, "I think she might [have], yes."

¶21    Reigelsperger also recalled telling Wife that he wanted her to get into the hot tub, but she said, "No, I'm not going to," and he responded, "Oh yes, you are." Reigelsperger said he asked Wife for a kiss and "one last jacuzzi," but she said, "I don't feel like doing it and you're not going to make me," and he replied, "Oh yes you are." Reigelsperger reported that he "grabbed [Wife] and held her and kissed her" while they were in the hot tub, and she "pushed [him] away and went and [cried] in the corner." When asked whether further sexual contact occurred, Reigelsperger stated that Wife did not perform oral sex on him.

¶22    At the conclusion of the interview, Detective informed Reigelsperger that he was going to be arrested. The detectives then handcuffed Reigelsperger and removed him from UNI.

¶23    During the weeks following his arrest, Reigelsperger spoke with a neighbor several times. In those conversations, which were recorded, Reigelsperger said he had held Wife "against her will . . . [s]o . . . [he was] definitely going to get something," and he "held [Wife] and . . . kissed her" but "[t]hat[] [was] it."

*The Charges and the Evidence at Trial*

¶24    Reigelsperger was charged with five first degree felonies: one count of aggravated kidnapping, *see* Utah Code Ann. § 76-5-

302 (LexisNexis 2012), and four counts of aggravated sexual assault, *see id.* § 76-5-405.[3] The charges were framed in the statutory language defining aggravated kidnapping and aggravated sexual assault, and every type of conduct identified in those statutes was alleged, as well as a brief statement of facts. The prosecution proceeded under the theory that four separate sexual assaults had occurred: (1) nonconsensual penetration of Wife's genital or anal opening (object rape, count II); (2) nonconsensual genital-to-mouth sexual act (forcible sodomy, count III); (3) nonconsensual touching of Wife's breast (forcible sexual abuse, count IV); and (4) nonconsensual touching of Wife's genitals (forcible sexual abuse, count V).

¶25 Before the case went to trial, Reigelsperger moved to suppress the statements he had made during his interview at UNI, asserting that the statements were elicited during custodial interrogation without a valid waiver of Reigelsperger's *Miranda* rights. The trial court denied the motion, concluding that Reigelsperger had not been in custody for *Miranda* purposes at that time. The court found that Reigelsperger was not in police custody in the days leading up to his interview, and after considering the site of the interrogation, whether the investigation focused on Reigelsperger, whether objective indicia of arrest were present, and the length and form of the interrogation, the court concluded that the attendant circumstances did not render the interview a custodial interrogation.

¶26 In support of its ruling, the trial court found, among other things, that the detectives did not misstate the facts, did not misrepresent the "state of the investigation," and did not mislead Reigelsperger "in any way"; and that Reigelsperger

---

3. Reigelsperger was also charged with one count of aggravated burglary, *see* Utah Code Ann. § 76-6-203 (LexisNexis 2012), but that charge was not pursued at trial.

"voluntarily participated," "seemed rather eager to tell his side of the story," was asked "very open ended" questions, and was not "coerced in any way to make the statements that he did." The court also found that the recorded portion of the interview constituted "the entire substance" of the interrogation, and the detectives' failure to record their earlier interactions with Reigelsperger appeared to be accidental rather than intentional.

¶27    At trial the prosecution relied on Wife's testimony; expert testimony that the swab from Wife's mouth contained DNA from seminal fluid that matched Reigelsperger's DNA; and the examining nurse's observations and interactions with Wife, from which the nurse concluded that Wife had experienced a traumatic event. The prosecution also introduced, among other evidence, the recording of Wife's 911 call; testimony from family members regarding Wife's appearance, conduct, and mental and emotional state following her encounter with Reigelsperger; statements Reigelsperger made to the detectives at UNI; Reigelsperger's conversations with his neighbor; and Reigelsperger's voicemail and text messages to Wife and another family member.

¶28    Defense counsel attempted to discredit Wife by, for example, pointing out inconsistencies between Wife's trial testimony and her earlier statements, including inconsistencies as to whether she and Reigelsperger removed all of their clothing before stepping into the hot tub, inconsistencies as to whether Reigelsperger attempted to have sexual intercourse with her, and the omission in Wife's earlier statements of Reigelsperger's threat to harm her if she tried to escape. Defense counsel also attempted to discredit Wife's testimony that she mistook the BB gun for a handgun and that she was "completely cooperative" with Reigelsperger because "the fact that there was a gun kept [her] from doing any kind of resisting, any kind of provoking."

¶29   In addition, Reigelsperger testified and presented a different account of the events in question. He testified that he went to the client's home to gather and put away tools. He brought the BB gun to the home to shoot rodents, and he placed the BB gun and extra ammunition on the pool table. He then began crying and decided to end his life. He brought in a ladder, set up the noose, and put it around his neck. At that instant, his dog went to the entryway and started barking. Reigelsperger saw Wife's car and watched as she made her way to the entrance, opened the door, and caught her finger in it. Knowing "there[] [was] no way that [Wife] would want to see [him]," Reigelsperger nevertheless went to the entryway, and she "freaked" upon seeing him. He "push[ed] the door harder on [Wife's] finger so it would" unlatch, and when her finger was free, she "went berserk."

¶30   According to Reigelsperger, Wife said "things that weren't really nice" but never told him to leave. He tried to hug her but she pushed him away, indicating that she wanted him to "get away from [her]." Wife saw the gun on the pool table, and Reigelsperger explained that it was a BB gun he had brought to kill rodents. Wife then saw the noose and ladder, and she began screaming. Wife indicated that she wanted to leave, but Reigelsperger told her, "no, [she] ha[d] to come in" and answer questions, such as whether she left him "for another man."

¶31   Reigelsperger asked Wife if she would get into the hot tub, and she said she did not want to, but Reigelsperger pleaded with her to do so. Wife stepped into the hot tub wearing only her underwear. Reigelsperger left to use the restroom, then returned and joined Wife in the hot tub. The BB gun was still on the pool table, where it remained until after Wife had left the house.

¶32   Reigelsperger asked if he could have "one last kiss and hug," and Wife responded, "[N]o," but when Reigelsperger walked toward her, Wife wrapped her legs around him and sat in his lap. Reigelsperger tried to kiss her, but she turned her

head. He touched Wife "between her legs" and penetrated her anus, but stopped when Wife said, "[O]uch." Reigelsperger kissed Wife, and she briefly kissed him back. He felt Wife's breasts until she said, "[S]top." Reigelsperger stood up, and Wife reached down and squeezed his penis. He turned toward her, putting his penis "toward[] her mouth" without saying anything. Wife performed oral sex on him, and afterward Reigelsperger told her she "probably should go." Wife then dressed and left.

¶33   Reigelsperger dressed and waited for the police to arrive. When they did, an officer escorted him to an ambulance, stating that the police were there to take care of him. The officer handcuffed Reigelsperger, "just for [Reigelsperger's] safety," and told Reigelsperger he was not under arrest. Reigelsperger was then taken to the hospital.

¶34   When asked whether all that happened between himself and Wife was consensual, Reigelsperger responded, "I don't know. [Wife] didn't jump right on it, no. She didn't say yes, let's have sex, or—but she never pushed me away, ever. . . . I guess she could've punched me in the face and pushed me away, yeah. So it probably was consensual."

*The Verdict*

¶35   The jury convicted Reigelsperger of aggravated kidnapping but did not convict him of the four aggravated sexual assault charges. Rather, the jury convicted Reigelsperger of four lesser included offenses: object rape, forcible sodomy, and two counts of forcible sexual abuse. Reigelsperger appeals.

ISSUES AND STANDARDS OF REVIEW

¶36   Raising several challenges to the proceedings below, Reigelsperger first asserts that he was given an incomplete

*Miranda* warning and therefore the trial court should have suppressed the statements he made during his interview at UNI. When reviewing the denial of a motion to suppress, we review the trial court's factual findings for clear error, *State v. Worwood*, 2007 UT 47, ¶ 12, 164 P.3d 397, and its legal conclusions for correctness, *State v. Baker*, 2010 UT 18, ¶ 7, 229 P.3d 650. A trial court's ultimate determination that a defendant was not subject to custodial interrogation and thus was not entitled to a *Miranda* warning is a mixed question of law and fact that we also review for correctness. *See State v. Levin*, 2006 UT 50, ¶¶ 32, 46, 144 P.3d 1096.

¶37　Second, Reigelsperger asserts that, due to defects in the jury instructions, he was convicted of the four sexual assault offenses "based upon facts and theories" of nonconsent and specific intent "for which [he] was not charged and/or bound over at preliminary hearing." Third, Reigelsperger asserts the jury was not adequately instructed that the State was required to prove he possessed (1) a culpable mens rea as to Wife's nonconsent, for purposes of the sexual assault offenses; and (2) intent or knowledge with respect to the elements of the aggravated kidnapping offense.

¶38　These alleged defects in the jury instructions were not brought to the trial court's attention, and "[a]s a general rule, claims not raised before the trial court may not be raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. Reigelsperger, however, asserts these errors under the exceptions for plain error and ineffective assistance of counsel. These "doctrines serve as exceptions to our preservation rules, permitting a court to review errors that would otherwise be forfeited." *State v. Bond*, 2015 UT 88, ¶ 46, 361 P.3d 104.

¶39　When a party fails to object to a jury instruction in the trial court, "the instruction may not be assigned as error except to avoid a manifest injustice," Utah R. Crim. P. 19(e), and in most circumstances manifest injustice is synonymous with plain error,

*State v. Powell*, 2007 UT 9, ¶¶ 11 & n.2, 17, 154 P.3d 788. To succeed on a claim of plain error, Reigelsperger must establish harmful error that should have been obvious to the trial court. *See Holgate*, 2000 UT 74, ¶ 13. To establish ineffective assistance of counsel, Reigelsperger must show that counsel's performance was deficient and prejudicial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

## ANALYSIS

### I. The Motion to Suppress

¶40    Reigelsperger asserts that the trial court erroneously denied his motion to suppress the statements he made during his interview at UNI. He argues that the statements resulted from custodial interrogation and were given following an inadequate *Miranda* warning.

¶41    Under the Fifth Amendment to the United States Constitution, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fourteenth Amendment incorporates this constitutional protection and applies it to the states, including the procedural safeguards initially set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966), which require that certain warnings be given prior to custodial interrogation if the resulting evidence is to "be used against [the accused]." *Id.* at 463–67, 478–79; *accord Dickerson v. United States*, 530 U.S. 428, 432, 434–35 (2000).[4] "Statements

_____

4. In his briefing on appeal, Reigelsperger mentions the Utah Constitution but does not further address it. We will not undertake a unique state constitutional analysis of our own accord. *See State v. Worwood*, 2007 UT 47, ¶ 19, 164 P.3d 397. Because Reigelsperger relies exclusively on federal constitutional

(continued…)

elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam).

¶42    In *Miranda* the Supreme Court examined the pressures on individuals cut off from family, friends, and familiarity and subjected to interrogation by officers practicing psychological manipulation. 384 U.S. at 442–58. The cases before the Court involved "incommunicado interrogation . . . in a police-dominated atmosphere," which resulted in incriminating statements made "without full warnings of constitutional rights." *Id.* at 445. Noting that the compelling nature of such an environment may prompt statements that do not reflect an individual's "independent decision" to speak, *id.* at 465, the Court held that the constitutional protection against self-incrimination applies to coercive situations in which persons are "questioned while in custody or otherwise deprived of [their] freedom of action in any significant way," *id.* at 445, 467.

¶43    In the half-century following *Miranda*, the Supreme Court has refined its analysis with regard to the coercion and "in custody or otherwise deprived of . . . freedom" aspects of its decision. *See, e.g.*, *Howes v. Fields*, 565 U.S. 499, 508–17 (2012); *J.D.B. v. North Carolina*, 564 U.S. 261, 268–81 (2011); *Yarborough v. Alvarado*, 541 U.S. 652, 660–69 (2004). As interpreted, *Miranda* applies only when "there has been such a restriction on a person's freedom as to render him 'in custody,'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam), and "custody" is not synonymous with supervision or control but is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion," *Howes*, 565 U.S. at 508–09.

---

(…continued)
law in making his claim, we likewise apply only federal constitutional law in resolving it.

¶44 Thus, while every "'interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime,'" that baseline level of compulsion does not trigger the requirement of a *Miranda* warning. *See State v. Mirquet*, 914 P.2d 1144, 1148 (Utah 1996) (quoting *Mathiason*, 429 U.S. at 495). In addition, being temporarily detained or even incarcerated at the time of questioning does not necessarily mean that a person must be apprised of his or her *Miranda* rights prior to questioning. *See Howes*, 565 U.S. at 512 ("Service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody."); *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) ("[P]ersons temporarily detained pursuant to [ordinary traffic] stops are not 'in custody' for the purposes of *Miranda*."). An individual's freedom of movement must be sufficiently curtailed, and sufficient coercive pressure must exist, to render a person in custody for *Miranda* purposes. *See Howes*, 565 U.S. at 508–09.

¶45 When determining "whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 509 (brackets, citations, and internal quotation marks omitted). "[H]ow a suspect would have gauge[d] his freedom of movement" is determined by examining "all of the circumstances surrounding the interrogation." *Id.* (second alteration in original) (citation and internal quotation marks omitted). Because the inquiry is an objective one, it does not turn on the "actual mindset" or "idiosyncrasies of [the] individual suspect" or on the "subjective views harbored by . . . the interrogating officers or the person being questioned." *J.D.B.*, 564 U.S. at 271 (citations and internal quotation marks omitted); *accord Stansbury*, 511 U.S. at 323. If the court concludes that the person's freedom of movement was sufficiently curtailed, the

court then asks "whether the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509.

¶46 Over thirty years ago, the Utah Supreme Court identified four factors (the *Carner* factors) "that inform this analysis: (1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of interrogation." *State v. Fuller*, 2014 UT 29, ¶ 44, 332 P.3d 937 (citation and internal quotation marks omitted). More recently, the United States Supreme Court noted several factors it has considered relevant to the custody analysis, which largely overlap those identified in *Salt Lake City v. Carner*, 664 P.2d 1168 (Utah 1983): the location and duration of the questioning, the statements made during the interview, the presence or absence of physical restraints, and whether the interviewee was released at the end of the questioning. *Howes*, 565 U.S. at 509.

¶47 These factors guide our analysis, in the context of the Supreme Court's refusal to "demarcate a limited set of relevant circumstances" that control the inquiry and to instead "require[] police officers and courts to examine all of the circumstances surrounding the interrogation." *J.D.B.*, 564 U.S. at 270–71 (citation and internal quotation marks omitted); *see also State v. Maestas*, 2012 UT App 53, ¶ 50, 272 P.3d 769 (stating that while the *Carner* factors "aid" in the custody analysis, "[n]o one factor is dispositive," and the custody determination depends on "the totality of the circumstances"). We thus consider the *Carner* factors,[5] as well as any additional factors indicated by the

5. The Utah Supreme Court has not indicated, and the parties have not argued, that the *Carner* factors should be retooled in light of evolving Supreme Court case law. Because we are required to consider all relevant circumstances, *see Howes v. Fields*, 565 U.S. 499, 509 (2012), and the Utah Supreme Court has

(continued…)

Supreme Court, within the broader contextual picture in determining whether the environment was "coercive enough to be custodial." *Cf. United States v. Pelletier*, 700 F.3d 1109, 1115 (7th Cir. 2012). And when, as a background matter, a person is subject to extensive, state-imposed restrictions on freedom of movement, the custody analysis should address "all of the features of the interrogation," including "the manner in which the interrogation [was] conducted." *Cf. Howes*, 565 U.S. at 514 (addressing the custody issue under circumstances involving the questioning of a person serving a term of imprisonment).

¶48    We note that the record is somewhat unclear with regard to Reigelsperger's status at UNI at the time his statements were made. Initially, Reigelsperger was taken by ambulance to a nearby hospital, where he was involuntarily admitted. Reigelsperger was subsequently transferred to UNI, but the record is silent as to the timing and process of that transfer and the conditions of Reigelsperger's stay, including whether he remained there involuntarily.

¶49    The parties do not address these questions, and they are not dispositive. For purposes of our analysis, we view Reigelsperger's status at UNI in the light most supportive of his claim that he was in custody for *Miranda* purposes. We therefore assume that, at the time his statements were made, Reigelsperger was subject to the extensive curtailment of freedom of action that is consistent with involuntary commitment for mental health treatment. We also assume that those restraints were State-imposed, emanating not simply from the provision of treatment but from the State's power to confine an individual to a

--------

(…continued)
recently identified the *Carner* factors as relevant, *State v. Fuller*, 2014 UT 29, ¶ 44, 332 P.3d 937, we consider each *Carner* factor in determining whether Reigelsperger was in custody.

treatment facility. Even with the benefit of these assumptions, however, Reigelsperger's challenge fails, for he was not in custody for *Miranda* purposes when he spoke with the detectives at UNI.

¶50   Reigelsperger asserts that the police involvement in his admission to the hospital and the detectives' attempts to monitor his status thereafter demonstrate that he was in *Miranda* custody, particularly when viewed in combination with the other circumstances attendant to his questioning. Reigelsperger first challenges the trial court's findings (and several subsidiary findings) that the police detectives did not effectively oversee his stay at UNI and that he was not in their custody prior to the interview. Reigelsperger claims the detectives were in "complete control" of his situation because, among other things, the detectives expected to know of his release in advance and an officer was stationed at the hospital until "it was determined that [Reigelsperger] would not be released except to law enforcement." (Internal quotation marks omitted.)

¶51   But Reigelsperger has not adequately supported these claims. Reigelsperger's last assertion lacks any supporting citation to evidence and does not appear to be borne out by the record. In addition, Reigelsperger does not marshal, counter, or even address the main evidence in support of the trial court's finding that he was not in police custody prior to the interview— specifically, the lack of police oversight of Reigelsperger's treatment; the obstacles the detectives faced in obtaining information from UNI; UNI's reluctance to allow the detectives to meet with Reigelsperger or even to acknowledge his presence there; and Detective's statements that while she "hope[d]" UNI would alert her before releasing Reigelsperger, she did not know whether that would occur. If a party fails to marshal the evidence in support of a challenged finding, the party "will almost certainly fail to carry its burden of persuasion on appeal," *State v. Nielsen*, 2014 UT 10, ¶ 42, 326 P.3d 645, and Reigelsperger has not shown the trial court's findings to be clearly erroneous.

¶52    Reigelsperger nevertheless relies on language from a Ninth Circuit Court of Appeals opinion, which suggests that if police "'took a criminal suspect to the hospital from the scene of a crime, monitored the patient's stay, stationed themselves outside the door, arranged an extended treatment schedule with the doctors, or [engaged in] some combination of these'" actions, the suspect could be in custody for *Miranda* purposes. (Quoting *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985).) Reigelsperger portrays his situation as a continuous period of police oversight and restraint, beginning with his being taken to the hospital and ending with his arrest at UNI, and argues that his case is sufficiently analogous to the Ninth Circuit's hypothetical situation to constitute custody. We disagree.

¶53    Reigelsperger *was* taken by police to the hospital, but not as a suspect. To the extent his freedom of movement was subsequently constrained as a general matter, it was due to his involuntary commitment for mental health treatment—not due to his potential culpability for conduct toward Wife. And as set forth below, those general constraints, coupled with any additional restraints or pressures resulting from the detectives' investigation, were not sufficiently restrictive and coercive to render Reigelsperger in custody for purposes of *Miranda*.[6]

---

6. Reigelsperger briefly asserts that a "compromised state of mind" led him to view the entire process as one of custodial police restraint, but the circumstances do not support that claim. As far as Reigelsperger's state of mind, the trial court found that Reigelsperger "voluntarily participated" and was not "coerced in any way to make the statements that he did," the recording provides no indication that Reigelsperger was not competently participating, and Reigelsperger has not challenged the court's findings or demonstrated that medications or treatment affected his faculties. In addition, although Reigelsperger repeatedly

(continued…)

¶54    On the day of the interview, Reigelsperger was escorted by "medical personnel" from his present location at UNI to "a large . . . waiting area" where he sat down on a couch between the two chairs in which the detectives were waiting. With regard to the location itself, Reigelsperger's transfer to the waiting area did not involve the "shock that very often accompanies arrest" when a person is "whisked [away]" from his normal surroundings to a "police-dominated atmosphere." *Cf. Howes v. Fields*, 565 U.S. 499, 511 (2012) (citation and internal quotation marks omitted). Reigelsperger also had no reason to believe that the answers he provided to the detectives' questions might result in his being released and allowed to go home. *Cf. id.* (noting the concern that an individual "arrested and taken to a station house for interrogation" might be "lured into speaking by a longing for prompt release"). The waiting area at UNI was thus not so restrictive and coercive as to constitute a per se custodial situation. *Cf. id.* at 511–12 (concluding that when a person is questioned on prison grounds, while serving a term of imprisonment, those circumstances are not alone dispositive of whether the person is in custody for *Miranda* purposes).

¶55    Any additional restraints or pressures resulting from the detectives' presence did not render the environment a custodial one. On the one hand, Reigelsperger was not released at the conclusion of the interview; he was arrested as the detectives had previously planned. Moreover, Reigelsperger likely would have surmised that he was a suspect under investigation. He had recently left a message for Wife apologizing for "intruding on [her] sexuality"; the detectives had just requested a DNA sample; the detectives advised Reigelsperger that he had the right to remain silent, his words could be used against him in

---

(…continued)

mentions the detectives' efforts to keep tabs on him at UNI, he does not claim he was aware of those efforts at the time.

court, and he had the right to an attorney; and the detectives' questions focused on the day in question and the events leading up to it. But while these factors favor a finding of *Miranda* custody, they are not determinative here.

¶56 Status as a suspect does not necessarily impose a warning requirement. "[S]ome suspects are free to come and go until the police decide to make an arrest," and a detective's beliefs concerning an individual's potential culpability are relevant only to the extent they would "affect[] how a reasonable person in that position would perceive his or her freedom to leave." *Stansbury v. California*, 511 U.S. 318, 325 (1994) (per curiam). Thus, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive." *Id.* And suspects have been questioned in many circumstances not amounting to custody. *See, e.g.*, *Howes*, 565 U.S. at 502–03, 517 (concluding that a defendant questioned while serving a jail sentence, regarding conduct that allegedly occurred prior to his imprisonment, was not in custody despite being confronted with allegations of criminal conduct by two armed deputies during a five-to-seven hour interrogation in a conference room of the jail facility); *Berkemer v. McCarty*, 468 U.S. 420, 423, 441–42 (1984) (concluding that the driver of a motor vehicle was not in custody when stopped and questioned, despite the state trooper's prior conclusion that the driver would be arrested and charged with a traffic offense); *Oregon v. Mathiason*, 429 U.S. 492, 494–95 (1977) (per curiam) (concluding that an individual suspected of theft and interviewed at a patrol office was not in custody).

¶57 In addition, the detectives' intent to arrest Reigelsperger had not been communicated to him, and he demonstrated no awareness that his stay at UNI would end momentarily with his apprehension. An unarticulated plan to arrest a suspect has no bearing on whether a suspect is "in custody at a particular time; the only relevant inquiry is how a reasonable [person] in the

suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442 (internal quotation marks omitted).

¶58 Other characteristics of the interview also suggest Reigelsperger was not in *Miranda* custody. Although Reigelsperger was not told that he could leave, he appeared "rather eager to tell his side of the story," the recorded interview was completed in less than thirty minutes, and there is no evidence that the detectives engaged in coercive tactics.[7] In addition, the detectives were not numerous, they were not in full uniform, and they were unarmed, carrying only a pair of handcuffs. Moreover, Reigelsperger was not restricted by medical equipment, by the detectives, or by UNI staff, and while Reigelsperger may not have been "free to leave the [waiting area] by himself" given his status as a patient in the facility, *cf. Howes v. Fields*, 565 U.S. 499, 515 (2012), neither the room nor its location generated a palpable impression that the detectives, rather than Reigelsperger, would control when the interview would end.

¶59 Taking into account all of the attendant circumstances, a reasonable person in Reigelsperger's situation would have felt he or she was "at liberty to terminate the interrogation," *see id.* at 509 (citation and internal quotation marks omitted), even if he or

---

7. Reigelsperger claims that "it is unknown what occurred in the unrecorded portion[]" of the encounter, but the detectives testified that they asked Reigelsperger for a DNA sample and he provided one, Reigelsperger then began talking, and Detective stopped him and informed him of some or all of his *Miranda* rights. The trial court found that the detectives did not mislead Reigelsperger, that their failure to record the initial portion of the encounter appeared to be "an accident," and that the recording reflected "the entire substance of the interview about the events in question." Reigelsperger has not shown those findings to be clearly erroneous.

she did not feel free to leave the facility or to leave the room without the permission and escort of a facility staff member, *see id.* at 515–17 (concluding that a prisoner who was "not free to leave the conference room by himself and to make his own way through the facility to his cell" was not in custody for *Miranda* purposes); *State v. Butt*, 2012 UT 34, ¶¶ 21–22, 284 P.3d 605 (concluding that a person interviewed in his jail cell was not in custody for *Miranda* purposes, although a person in those circumstances would "not feel 'free to leave'"). In addition, the environment did not "present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *See Howes*, 565 U.S. at 509. We therefore conclude, given the totality of the circumstances, that Reigelsperger was not in custody and thus was not entitled to a *Miranda* warning, and the trial court did not err in denying his motion to suppress on that basis. *Cf. Butt*, 2012 UT 34, ¶ 22 (concluding that a suspect interviewed in his jail cell was not in custody, where he "was not restrained beyond his usual status as a jail inmate, nor was he coerced in any way").

## II. The Alleged Broadening of the Jury Instructions Beyond the State's Asserted Theory of the Case

¶60 Reigelsperger next asserts that the State improperly expanded the scope of its prosecution at the close of trial. In his view, the jury instructions addressing the sexual assault offenses were impermissibly broader than the State's asserted theory of the case, with regard to both nonconsent and the intent required to commit forcible sexual abuse.

¶61 With regard to nonconsent, Reigelsperger claims that only one theory of nonconsent was alleged in the information and supported by evidence at the preliminary hearing: that Wife submitted to the alleged sexual acts due to the presence of a gun and threats of bodily injury. According to Reigelsperger, the prosecution relied on this singular theory of nonconsent when arguing that Reigelsperger should be bound over, and as a result

the prosecution "narrowed the charges to the specific theor[y]" asserted in the bindover proceeding. He contends that, at trial, "the prosecution did not maintain these charged and/or bound-over particulars." Instead, the jury was instructed that "object rape, forcible sodomy, or forcible sexual abuse is without the consent of the victim" under several circumstances, and the jury was also instructed that it was "not precluded from determining that" still other circumstances could "amount to a lack of consent in this case." Thus, Reigelsperger claims, "the jury likely convicted [him] for some . . . theory of non-consent" other than the presence of a gun or threats of bodily injury, as "highlighted" by the fact that the "jury did not convict [him] of the aggravated sexual [assault] charges."

¶62    Reigelsperger employs this same reasoning to challenge the jury instructions regarding forcible sexual abuse. In his view, the jury was improperly instructed that he committed the forcible sexual assaults alleged in counts IV and V of the information if he touched Wife *either* "'with the intent to cause substantial emotional or bodily pain'" *or* "'with the intent to arouse or gratify the sexual desire of any person.'" Reigelsperger asserts the charges were narrowed based on the prosecution's argument at the preliminary hearing, such that he could be convicted of count IV only if he intended to cause bodily pain and count V only if he intended to gratify the sexual desire of any person.

¶63    Thus, Reigelsperger concludes, his four sexual assault convictions "were based upon facts and theories concerning the element of non-consent, and on two occasions the element of specific intent, for which he was not charged and/or bound over at preliminary hearing." He does not assert a "defect in the information," a "defect in bindover," or a "lack of evidence at the preliminary hearing." Rather, his contention is that "[i]n arguing probable cause for the bind-over, the prosecutor narrowed the charges" to the theories of nonconsent and specific intent asserted. Because "a criminal defendant may not be

convicted of an offense different from that upon which he was bound-over at preliminary hearing," Reigelsperger concludes, this court must "vacate the sexual assault convictions."

¶64   As noted above, these challenges are raised for the first time on appeal as claims of plain error and ineffective assistance of counsel. To demonstrate plain error, a defendant must establish error that "should have been obvious to the trial court" because it "contravenes settled appellate law" or plain statutory language. *Zavala v. Zavala*, 2016 UT App 6, ¶ 27, 366 P.3d 422 (citations and internal quotation marks omitted); *see also State v. Dean*, 2004 UT 63, ¶ 16, 95 P.3d 276 (noting that a defendant "must show that the law governing the error was clear at the time the alleged error was made"). Additionally, if trial counsel's timely objection to the alleged error would have been futile because the objection lacked merit, failure to raise the objection does not constitute ineffective assistance. *See State v. Bond*, 2015 UT 88, ¶ 63, 361 P.3d 104.

¶65   As the State points out, as a factual matter, neither the information nor the prosecution's argument at the preliminary hearing indicates that "the State was limiting itself to specific theories of consent or specific intent," nor did the court order binding Reigelsperger over on the sexual assault offenses "limit the State to such specific theories." Moreover, as a legal matter, Reigelsperger has not demonstrated that the asserted errors should have been obvious to the trial court or that his counsel performed ineffectively by failing to object to the jury instructions.

¶66   Reigelsperger was charged with four counts of aggravated sexual assault, and the language of each charge was drawn directly from the statutory definition of the offense. *See* Utah Code Ann. § 76-5-405 (LexisNexis 2012). Each charge asserted the full range of conduct and intent that could give rise to the offense, alleging that Reigelsperger, in the course of

committing or attempting to commit rape, object rape, forcible sodomy, or forcible sexual abuse, did

> (i) use, or threaten the victim with the use of, a dangerous weapon . . . ;
> (ii) compel, or attempt to compel, the victim to submit to rape, object rape, forcible sodomy, or forcible sexual abuse, by threat of kidnapping, death, or serious bodily injury to be inflicted imminently on any person; or
> (iii) receive aid or abetment from one or more persons . . . .

¶67 The jury instructions mirrored the charges. The jury was instructed that Reigelsperger committed aggravated sexual assault if he, in the course of an object rape (count II), forcible sodomy (count III), or forcible sexual abuse (counts IV and V), used or threatened Wife with the use of a dangerous weapon or compelled or attempted to compel Wife to submit to the act by threat of kidnapping, death, or serious bodily injury to be inflicted imminently on any person.

¶68 The jury was also instructed as to the elements of the underlying sexual assault offenses. To convict Reigelsperger of forcible sexual abuse, the jury was required to find that, among other things, Reigelsperger engaged in certain conduct without the consent of Wife, "with the intent to cause substantial emotional or bodily pain to [Wife] or with the intent to arouse or gratify the sexual desire of any person." These instructions closely track the statutory definition of forcible sexual abuse. *See id.* § 76-5-404(1).

¶69 When, as here, a defendant is charged with aggravated sexual assault in language that essentially reiterates the statutory definition of that offense, the defendant has "notice that he [will] have to defend against any variation of [sexual] assault that the evidence might support." *Cf. State v. Sanislo*, 2015 UT App 232,

¶ 16, 359 P.3d 1287. Reigelsperger was charged with four counts of aggravated sexual assault and convicted of four sexual assault offenses, based on the same general evidence and allegations outlined in the information and presented at the preliminary hearing. It is difficult to perceive how a "reasonable person aware of [the alleged] facts and the charged offenses could have been surprised" when, as was the case here, the prosecution pursued convictions based on the statutorily defined variations of intent and conduct that give rise to the lesser included sexual assault offenses. *Cf. id.* ¶ 19; *State v. Carruth*, 1999 UT 107, ¶¶ 13–14, 993 P.2d 869 (concluding that the prosecution may request jury instructions for lesser offenses necessarily included in those charged).

¶70    Reigelsperger cites no legal decision or other authority suggesting that the charges and allegations in the information did not support prosecution of the full range of conduct prohibited by the statutes he was charged with violating. Under Utah law, statements plucked from the prosecution's argument at a preliminary hearing, in which the prosecution characterized some of the evidence and highlighted some of its theories of the case, do not rule out the State's pursuit of other theories at trial of which the charges provided notice. *Cf.* Utah R. Crim. P. 21(e) (permitting the jury to "return a verdict of guilty to the offense charged or to any offense necessarily included in the offense charged or an attempt to commit either the offense charged or an offense necessarily included therein").

¶71    Because Reigelsperger has failed to provide any settled law supporting his claim, and because trial counsel's objection to the claimed error would have failed for lack of merit, Reigelsperger has not established plain error or ineffective assistance of counsel with regard to the theories and evidence underlying his sexual assault convictions. *See State v. Bond*, 2015 UT 88, ¶ 63, 361 P.3d 104 (rejecting a claim of ineffective assistance of counsel, concluding that if trial counsel had made the motion at issue, it would have been futile); *State v. Dean*, 2004

UT 63, ¶ 21, 95 P.3d 276 (rejecting a claim of plain error because "the law in this area was not plainly settled so as to have adequately guided the trial court" at the time the alleged error occurred).

### III. The Instructions Regarding Nonconsent

¶72 In his third challenge to the proceedings below, Reigelsperger asserts that the jury instructions with regard to the underlying sexual assault offenses "led the jury to incorrectly believe that [he] could be convicted of the sexual crimes *absent a culpable mens rea specifically regarding consent*." The State concedes that "[t]he sexual assault instructions do appear to be erroneous," but claims Reigelsperger was not prejudiced by the improper instruction. Given the substantial evidence presented to the jury "not only that [Wife] did not consent, but that [Reigelsperger] was aware of her lack of consent," the State asserts that, if properly instructed, the jury would have determined Reigelsperger was at least reckless with regard to Wife's nonconsent. We agree.

¶73 "[T]he crime of rape requires proof not only that a defendant 'knowingly, intentionally, or recklessly had sexual intercourse,' but also that he had the [same] requisite mens rea as to the victim's nonconsent." *State v. Barela*, 2015 UT 22, ¶ 26, 349 P.3d 676 (quoting *State v. Marchet*, 2009 UT App 262, ¶ 23, 219 P.3d 75).[8] Thus, when a defendant is on trial for that offense,

---

8. For purposes of this appeal, the State does not contest that this principle, applied with respect to the offense of rape, "also applies to other sexual crimes requiring proof of the victim's nonconsent." Given the State's position as well as our conclusion that any error in the instructions did not prejudice Reigelsperger, we assume without deciding that the principle applies more broadly and that the instructions for all of the sexual assault

(continued…)

a jury must be fairly instructed that the offense requires a knowing, intentional, or reckless state of mind as to the element of nonconsent. *See Marchet*, 2009 UT App 262, ¶ 23.

¶74   For each of the four sexual assault offenses, the jury was instructed that to convict Reigelsperger, it must find that:

1.  Reigelsperger engaged in specified sexual activity with Wife and, where applicable, he did so with the requisite specific intent;
2.  "Reigelsperger acted intentionally, knowingly or recklessly";
3.  "[Wife] is a person . . . 14 years of age or older"; and
4.  "The[] acts occurred without [Wife's] consent."

¶75   The requirement that Reigelsperger must have acted intentionally, knowingly, or recklessly was thus placed in the middle of the jury instruction, while the element of nonconsent was placed at the bottom of the list. Because the mens rea requirement appears directly after several substantive elements of the offense, while the element of nonconsent was articulated subsequently and separately, the jury instructions implied that no particular mens rea was required as to nonconsent. *See Barela*, 2015 UT 22, ¶ 26.

¶76   As noted previously, this defect in the jury instructions was not brought to the trial court's attention and is asserted on appeal in claims of plain error and ineffective assistance of counsel. Both claims require Reigelsperger to show that the alleged error was prejudicial to him, and the prejudice standard is the same for both claims. *See State v. McNeil*, 2016 UT 3, ¶¶ 25,

---

(…continued)
offenses at issue here were erroneous as to the mens rea required with respect to nonconsent.

29, 365 P.3d 699. Reigelsperger must establish a reasonable probability that, but for the error, "'the result of the proceeding would have been different,'" or in other words, "'a probability sufficient to undermine [our] confidence in the outcome.'" *See id.* ¶ 27 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

¶77 Failure to properly link the mens rea requirement with the element of nonconsent certainly may undermine our confidence in a sexual assault conviction, depending on the circumstances. For example, when the evidence consists largely of competing narratives as to whether generally undisputed sexual activity was consensual, a jury might conclude that the sexual activity was nonconsensual but, if properly instructed, nevertheless entertain reasonable doubt as to whether the defendant was reckless as to the lack of consent. *See, e.g., Barela*, 2015 UT 22, ¶¶ 28–32 (reversing a rape conviction, concluding that "a reasonable jury could have found the truth to lie somewhere between" the accounts presented by the prosecution and the defense, and the jury therefore could have, if correctly instructed, determined "that [the defendant] had neither knowledge nor recklessness" as to the victim's nonconsent).

¶78 Here, the jury found Reigelsperger recklessly, knowingly, or intentionally engaged in the specified conduct; where required, he acted with the specified intent, such as the "intent to arouse or gratify the sexual desire of any person"; and he did so without Wife's consent. But "that does not . . . mean that the jury accepted [Wife's] story lock, stock, and barrel." *See State v. Barela*, 2015 UT 22, ¶ 30, 349 P.3d 676. Indeed, although urged by the prosecution to convict Reigelsperger of several counts of aggravated sexual assault, based largely on Wife's testimony, the jury found Reigelsperger not guilty of those charges and instead convicted him of offenses that did not require use or threatened use of a dangerous weapon or threats of kidnapping, death, or serious bodily injury.

¶79 Although the record does not reveal the jury's rationale, there is a reasonable possibility that the jury did not entirely credit Wife's testimony, such as her statement that she was "completely cooperative" with Reigelsperger's sexual advances because "the fact that there was a gun kept [her] from doing any kind of resisting, any kind of provoking." Yet even assuming the jury found the truth to lie somewhere between Reigelsperger's and Wife's accounts, Reigelsperger's own statements and testimony rule out any reasonable probability that the jury would have concluded that he was not at least reckless with regard to Wife's nonconsent.

¶80 At trial Reigelsperger was asked whether "[t]his was all consensual," and he replied, "I don't know. [Wife] didn't jump right on it, no. She didn't say yes, let's have sex, or—but she never pushed me away, ever. . . . I guess she could've punched me in the face and pushed me away, yeah. So it probably was consensual." Nonconsent cannot be determined simply by asking whether a person physically fought back or attempted to escape. *See id.* ¶¶ 39–41; Utah Code Ann. § 76-5-406 (LexisNexis 2012). Moreover, Reigelsperger's use of the words "I don't know" and "probably" implicitly acknowledge his awareness of a risk of nonconsent, and that awareness was further confirmed to the jury when it heard Reigelsperger's voicemail message to Wife, stating, "I'm so very sorry for offending you and intruding on your sexuality . . . ."

¶81 "[T]he essence of consent is that it is given out of free will," and determining whether someone has "truly consented" requires close attention to a wide range of contextual elements, including verbal and nonverbal cues. *Barela*, 2015 UT 22, ¶¶ 39, 43 (citation and internal quotation marks omitted). Determining whether a person was criminally reckless with regard to another's nonconsent involves a similarly contextual inquiry, *cf. id.*, and Reigelsperger's statements and testimony were replete with references to contextual elements indicating nonconsent, such that once the jury concluded Wife had not consented, there

was no reasonable probability that the jury would conclude Reigelsperger was not at least criminally reckless in that regard.

¶82    At trial Reigelsperger confirmed his understanding that Wife desired no contact or interactions with him outside of their divorce proceedings and that she preferred to communicate with him about their property management business only through text or voicemail messages. Reigelsperger also confirmed his understanding that, on the day in question, "there[] [was] no way [Wife] would want to see [him]," and described Wife's reaction upon seeing him and observing the gun, noose, and ladder as being "freaked," going "berserk," and "frantic[ally] cry[ing] and screaming." Reigelsperger further testified that when he and Wife were in the entryway, he "tried to hug [Wife], and she pushed [him]," indicating that she wanted him to "get away from [her]." He recounted Wife's statement that she "want[ed] to leave" as well as his reply that "no, [she] ha[d] to come in," and testified that when asked if he could "have one last kiss and hug," Wife "said no."

¶83    The jury also heard Reigelsperger's statements during his interview at UNI, when he recalled telling Wife, "I want you to get in the jacuzzi with me," she responded, "No, I'm not going to," and he replied, "Oh yes, you are." Reigelsperger further recounted that he had asked Wife for "a kiss" and "one last jacuzzi," Wife responded, "I don't feel like doing it and you're not going to make me," and he replied, "Oh yes you are." Reigelsperger also described the encounter in the hot tub, saying, "I grabbed [Wife] and held her and kissed her, and she pushed me away and went and was crying in the corner."

¶84    A person is criminally reckless "when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur," meaning that the risk is "of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as

viewed from the actor's standpoint." Utah Code Ann. § 76-2-103(3) (LexisNexis 2012). When a person has repeatedly been told "no" prior to engaging in or demanding sexual contact, and responds with statements like "yes you will," "yes you are," or I will "make" you, there exists a pattern of imposing one's will onto another such that, absent sufficient affirmative indication of permission to engage in sexual contact, those verbal protests, even if intermittent and even if they subsequently cease, nevertheless establish the defendant's awareness and conscious disregard of a substantial and unjustifiable risk of nonconsent for that immediate period.

¶85 Reigelsperger points to Wife's "cooperat[ion] with the sexual activities in the hot tub" and alleged lack of efforts to escape, and argues that she also "did not say no" and "did not resist," thus giving the jury a reasonable basis for finding that he was not reckless with regard to nonconsent. But cooperation cannot be viewed in a vacuum. And Reigelsperger's assertions are not only inaccurate, even looking solely at his accounts of the day in question, they also lack context—limited to the few minutes in which Wife did not speak and ignoring that, when she did, Wife indicated her desires to leave, not to be with Reigelsperger, and not to engage in certain activities or have sexual contact with him. When refusals, rejections, or resistance are met with disregard, hostility, and commands to submit, any limited cooperation that immediately follows cannot be said, without more, to constitute consent. And Reigelsperger's identification of some types of resistance Wife did not pursue— such as escape or physical attacks—does not undercut the various ways in which Wife *did* indicate nonconsent.

¶86 Reigelsperger also asserts that he stopped touching Wife when her words suggested physical discomfort. Even assuming Reigelsperger did not intend to inflict physical pain on Wife, that would not render any less compelling the evidence that he insisted on sexual contact that was not physically painful and that he was, at best, grossly indifferent as to whether Wife

consented to that contact. Finally, Reigelsperger asserts that he was not in a proper state of mind on the day in question but presents no substantive argument that he was legally unaccountable for his actions and points to no evidence that he was impaired in his ability to perceive or process Wife's nonconsent. As noted above, the evidence did not suggest lack of understanding of Wife's wishes, for Reigelsperger countered her express resistance with express insistence, and he ignored or disregarded her obvious distress as well as numerous other indications of nonconsent.

¶87    Once the jury found that Wife did not consent to the sexual conduct, there was no reasonable probability that the jury would not have found Reigelsperger at least criminally reckless with regard to that nonconsent. Accordingly, Reigelsperger has not established a reasonable probability that, but for the error in the jury instructions, the result of the proceeding would have been different. *Cf. State v. Ochoa*, 2014 UT App 296, ¶¶ 6–7, 341 P.3d 942 (concluding that although the jury "was not instructed on the mental state required for [the] offense," "there was no rational basis for the jury to have concluded that" the defendant did not possess the mens rea required for commission of the offense).

IV. The Instruction Regarding Aggravated Kidnapping

¶88    In his final challenge, Reigelsperger asserts the jury instructions as to aggravated kidnapping were "a mess," leaving the jury unable to "clearly decipher the . . . mens rea necessary to convict on" that charge. He contends the jury was not properly instructed that he must have acted intentionally and knowingly in the commission of kidnapping or unlawful detention and in the possession, use, or threat to use a dangerous weapon.

¶89    Instruction 19 set out the elements of the aggravated kidnapping offense, but rather than attach the appropriate mens

rea requirement to each element, the instruction concluded with a general requirement of intent or knowledge:

> [Y]ou must find from all of the evidence and beyond a reasonable doubt each and every one of the following elements of th[e] offense:
>
> 1.    That . . . Reigelsperger, in the course of unlawfully detaining or kidnapping [Wife];
> 2.    (a) possessed, used, or threatened to use a dangerous weapon; **OR**
>       (b) acted with intent:
> > (i) to commit or to facilitate the commission, attempted commission, or flight after the commission of aggravated sexual assault, forcible sodomy, object rape, or forcible sexual abuse; **OR**
> > (ii) to inflict bodily injury on or to terrorize [Wife] or another;
> > **AND**
> 3.    [Reigelsperger] acted intentionally or knowingly.

(Emphasis in original.)

¶90    When addressing an appellant's challenge to a jury instruction, we look at the "instructions in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case." *State v. Plexico*, 2016 UT App 118, ¶ 30, 376 P.3d 1080 (citation and internal quotation marks omitted). Here, the "intentional or knowing" requirement applicable to the first element of the offense—commission of unlawful detention or kidnapping—was laid out in subsequent instructions. *See* Utah Code Ann. § 76-5-301 (LexisNexis 2012) (providing that the applicable mens rea for kidnapping is intentional or knowing); *id.* § 76-5-304 (providing that the

applicable mens rea for unlawful detention is intentional or knowing). Reigelsperger does not contend that those subsequent instructions were deficient, and thus concedes that the jury instructions as a whole adequately conveyed the mens rea requirement as to that element. *See Plexico*, 2016 UT App 118, ¶ 31 (concluding that the contested jury instructions were not erroneous because, "when considered as a whole, [they] accurately instructed the jury [regarding] the basic elements of the offense and the required mens rea").

¶91 But Reigelsperger contends that the intentional or knowing mens rea requirement was not sufficiently linked to the dangerous weapon element set out in 2(a)—the possession, use, or threatened use of a dangerous weapon. And in a somewhat contradictory claim, Reigelsperger asserts that the jury would attempt to link the general mens rea requirement to the specific intent elements set out in 2(b), and would then be confused into nullifying those elements' requirements of specific intent.

¶92 As with several of Reigelsperger's other objections and as set forth above, these issues are raised for the first time on appeal as claims of plain error and ineffective assistance of counsel. To establish plain error a defendant must show obvious error, *supra* ¶¶ 64, 71, and a claim of ineffective assistance is similarly difficult to demonstrate. "Judicial scrutiny of counsel's performance [is] highly deferential" and includes a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland v. Washington*, 466 U.S. 668, 689–90 (1984). The law does not require counsel to seek resolution of every unsettled legal question that might bear on the proceeding, *see New v. United States*, 652 F.3d 949, 952 (8th Cir. 2011), or to make every novel argument new counsel may later derive and assert for the first time on appeal, *see State v. Love*, 2014 UT App 175, ¶ 7, 332 P.3d 383. Rather, "the proper standard for attorney performance is that of reasonably effective assistance." *Strickland*, 466 U.S. at 687.

¶93   In 2012, almost two years prior to Reigelsperger's trial, this court addressed a jury instruction similar to the one given in this case, in that it set out the elements of rape and added, at the end of the instruction, the requirement that "the defendant acted intentionally or knowingly or recklessly." *State v. Marchet*, 2012 UT App 197, ¶ 18, 284 P.3d 668 (internal quotation marks omitted). This court concluded that the instruction, as given, "accurately identified each element of the crime . . . and correctly stated the applicable mental state." *Id.* ¶ 19 (citation and internal quotation marks omitted). While noting that the instruction could have been clearer, *id.* ¶ 19 n.5, this court concluded that the jury had been "properly informed . . . as to the elements and mental state of the crime," *id.* ¶ 19. And the Utah Supreme Court subsequently commented, with respect to a similar instruction, that it "at least arguably suggests that the mens rea element applies to all of the above-listed elements," although the court did not resolve whether the instruction provided "an accurate statement of law." *State v. Barela*, 2015 UT 22, ¶ 26 n.3, 349 P.3d 676.

¶94   Given this court's conclusion in *Marchet*, Reigelsperger cannot succeed on his claims that the aggravated kidnapping instruction was obviously wrong and that the failure to object to it was an "omission[] . . . outside the wide range of professionally competent assistance." *See Strickland*, 466 U.S. at 690. Reigelsperger attempts to distinguish *Marchet*, arguing that because the jury instruction in his case included references to specific intent, the general intentional and knowing requirement "inundated" the jury with "mens rea references," thus rendering the instruction unclear and inaccurate. But even assuming that were the case, we are not addressing the issue de novo. We are considering whether any such error was obvious to the trial court and whether the failure to raise it was outside the bounds of reasonable professional judgment. We conclude that it was not, for Reigelsperger points to no appellate decision in support of his claim, and several decisions weigh against it.

¶95     This court has upheld instructions in which specific intent was required for a particular element but an overarching mens rea instruction was nonetheless given. In *State v. Kennedy*, for example, the jury was given a general instruction that "the defendant must have acted intentionally or knowingly or recklessly"; but the jury was also instructed that, to commit the specific offense, the defendant must have acted "*[w]ith the intent* to hinder, delay, or prevent the investigation, apprehension, prosecution, conviction, or punishment of any person regarding a criminal offense." 2015 UT App 152, ¶¶ 25–26, 354 P.3d 775 (internal quotation marks omitted). The defendant asserted that the instructions were erroneous and that they had led the jury to conflate the specific intent requirement with the requirement of intentional, knowing, or reckless conduct. *Id.* ¶ 27. This court disagreed, concluding that the defendant had not established plain error or ineffective assistance of counsel. *Id*. ¶ 30; *see also, e.g.*, *State v. Plexico*, 2016 UT App 118, ¶¶ 13, 29–31, 376 P.3d 1080 (concluding that the jury instructions accurately conveyed the "elements of the offense and the required mens rea," where the jury was given a general mens rea instruction along with an instruction requiring a certain belief or an intent to prevent an official proceeding or investigation).

¶96     Utah law thus suggests juries can, without being specifically instructed, conclude that a general mens rea requirement applies to all elements of an offense, except where a specific mental state is expressly indicated. Reigelsperger does not cite any decision to the contrary. Because Reigelsperger has failed to provide any settled law supporting his claim, he has not established plain error with regard to the jury instruction as to the aggravated kidnapping charge. *See supra* ¶ 71; *see also State v. Roman*, 2015 UT App 183, ¶ 11, 356 P.3d 185 (concluding that, given the lack of "settled law on this point, any error [in that regard] . . . would not have been obvious to the district court"). Moreover, although there may be circumstances in which trial counsel's failure to raise an unsettled legal question will

constitute ineffective assistance, we cannot conclude that, under the circumstances present here, trial counsel's failure to object to the jury instruction fell below the standard of "reasonably effective assistance." *See Strickland*, 466 U.S. at 687. The trial court thus did not plainly err in giving the instruction nor did trial counsel render ineffective assistance by failing to raise the issue.

CONCLUSION

¶97 The trial court correctly concluded that Reigelsperger was not in custody for *Miranda* purposes when he spoke with the detectives at UNI, and thus Reigelsperger's motion to suppress those statements was properly denied. In addition, Reigelsperger has failed to demonstrate plain error or ineffective assistance of counsel stemming from the facts and theories underlying his sexual assault convictions. Reigelsperger has likewise failed to demonstrate plain error or ineffective assistance of counsel with regard to the instructions outlining the elements of the sexual assault and aggravated kidnapping offenses. Accordingly, the trial court's judgment is affirmed.

_____